No. 66,290

LESLIE W. BLEVINS, SR., TIMOTHY MILLER, and PATTY BOYER, *Appellants,* v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOUGLAS, *Appellee.*

(834 P.2d 1344)

Opinion filed July 10, 1992.

*Donald G. Strole,* of Lawrence, argued the cause, and *Jeffrey B. Stephens* and *Robert V. Eye,* of Lawrence, were with him on the briefs for appellants.

*Robert W. Fairchild,* of Riling, Burkhead, Fairchild & Nitcher, Chartered, of Lawrence, argued the cause, and *John W. Nitcher,* of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

HERD, J.: Leslie W. Blevins, Sr., Timothy Miller, and Patty Boyer (plaintiffs) appealed the dismissal of their case against the Board of Commissioners of Douglas County (County) which sought injunctive relief to prevent the County from spending the proceeds of certain bonds on a county trafficway project. In an unpublished opinion filed October 11, 1991, the Court of Appeals reversed the district court's dismissal and remanded for further proceedings. We granted the County's petition for review.

Let us review the history of this dispute. In 1985, the County adopted a home rule resolution authorizing the issuance of general obligation bonds to pay for a proposed trafficway south of the city of Lawrence, Kansas. The bonds were issued in 1986. In 1987, Blevins sued the County, contending issuance of the bonds was illegal because the County was not authorized to do so under its home rule powers. See *Blevins v. Hiebert,* 245 Kan. 646, 783 P.2d 1260 (1989) (*Blevins I*). In *Blevins I,* we found the County had exceeded its home rule authority in issuing the bonds and should have followed the provisions of K.S.A. 68-580 *et seq.,* which requires a public vote approving bond issues of the type in question. 245 Kan. at 653. In *Blevins I,* we entered judgment for Blevins, who had sought an injunction preventing the County from spending the money raised by the bonds without the approval of the voters.

The opinion in *Blevins I* was filed December 8, 1989. On January 31, 1990, we issued an order granting a rehearing and withdrawing the opinion in *Blevins I.* On rehearing, we issued a second opinion, *Blevins v. Hiebert,* 247 Kan. 1, 795 P.2d 325 (1990) (*Blevins II*), in which we reaffirmed that the County had exceeded its home rule powers and illegally issued the bonds. 247 Kan. at 13. We again found the bonds should have been issued pursuant to K.S.A. 68-580 *et seq.,* which requires a public vote. 247 Kan. at 13. After a lengthy discussion of the history of home rule powers, however, we validated the bonds, stating:

"Because of the confusion caused by the dicta in our prior decisions on home rule, we hold all general obligation bonds and temporary notes authorized or issued under home rule powers prior to the date of this opinion are hereby declared lawful and validated as to the home rule issue. All such bonds and temporary notes authorized and issued after the date of this opinion under home rule authority shall follow the procedure set out herein." 247 Kan. at 14.

The present case arises from an advisory election which was held in Douglas County in which the voters were asked to approve the bonds. The decision to hold the election was apparently made after *Blevins I* was filed, but before the rehearing which resulted in *Blevins II* was granted. On December 20, 1989, Special County Counselor John Lungstrum sent a letter to Blevins' counsel, which stated:

"I am writing at your request to clarify Douglas County's position concerning the above litigation and our hope that we might be able to reach a resolution of this matter which avoids the most disastrous consequences for the taxpayers of the county and for the bondholders. First of all, I should reiterate that the County feels that it acted legally when it took the steps which it took in 1985. By contrast, we understand that Mr. Blevins believes that a public vote was required to take those steps. Thus far, the Supreme Court has agreed with him on that point. In recognition, *the County has irrevocably committed itself to holding an election as a precondition to spending bond proceeds on the trafficway project,* regardless of any action which the Court might take on the motion to reconsider. For all intents and purposes, then, the argument between Mr. Blevins and the County is over and his position has prevailed." (Emphasis added.)

The letter then detailed a number of disastrous consequences the County and bondholders could face if the bonds were not validated by the Supreme Court on rehearing. The letter also said the County "cannot, as a practical matter, sell its bonds until this issue is cleared up." The letter then concluded:

"The suggested remedy which we are requesting Mr. Blevins to consider taking a cooperative approach toward is asking the Court to, at the least, restrict its ruling to act prospectively, only. That is, based upon Douglas County's reasonable reliance on the Attorney General's opinion and the Attorney General's belief that the action was appropriate, especially under circumstances where the Attorney General plays a heightened role with regard to these bonds, the Court should modify its opinion to validate these bonds even though its opinion would be effective for future purposes.

"I want to stress that even if the Court were to grant the County's motion and change its opinion, validating the bond issue, Douglas County is fully committed to the election process. All we are trying to do is avoid catastrophic consequences which I am sure Mr. Blevins did not intend to have occur."

On December 28, 1989, County Commission Chairperson Nancy Hiebert executed a sworn affidavit which was attached to the County's petition for rehearing in *Blevins I.* The affidavit states in pertinent part:

"On December 13, 1989, December 18, 1989, and December 20, 1989, the Board of County Commissioners discussed holding an *advisory election* on the financing of the South Lawrence Trafficway. Since the general obligation bonds for the South Lawrence Trafficway were issued as part of the 1985 series [issued in 1986] of general obligation refunding and improvement bonds and are presently outstanding, the election must be advisory in nature. *The Board of County Commissioners has agreed publicly, however, to be bound by the results of the election.*" (Emphasis added.)

There were also public statements by County Commissioners Louie McElhaney and Michael Amyx reported in the local newspaper to the effect that, although the election was technically advisory in nature, the County would abide by the results.

In January 1990, Blevins filed a response to the County's motion for rehearing, contending that *Blevins I* was properly decided and arguing against a prospective-only application of the holding. In February 1990, however, Blevins filed a supplemental brief which, although maintaining the position that the County's actions were illegal, contained the following statement:

"The Court has requested argument concerning possible prospective application of the Court's decision in this matter. Plaintiff's position on prospective application of the Court's decision is conditioned on several factors. He feels that the rash actions of the County and its bond counsel, and the inequitable manner in which he and all other taxpayers in Douglas County have been treated, warrants current application of the Court's opinion, *see* plaintiff's discussion of the Laches issue below.

"However, in recognition of the possible damage to the financial reputation of the County and its abilities to fund necessary local activities, and realizing that both governing bodies of Douglas County and the City of Lawrence have publicly stated that the South Lawrence Trafficway will be submitted for voter approval, plaintiff has no objection to a prospective application of the Court's decision conditioned upon the Trafficway being submitted for voter approval in a binding election, as promised by both governing bodies."

In September 1990, the Board of County Commissioners passed a resolution calling for an election on the question of whether to spend the bond proceeds. The resolution contained recitals of the history of the bonds and the amounts involved, along with the following:

"WHEREAS, the Board has been advised by legal counsel that the only way the Board can lawfully call a referendum on the question of County financing of the local share of the costs of the Trafficway project is to schedule an *advisory referendum* on the subject in accordance with the home rule powers granted to the Board under K.S.A. 19-101, et seq. . . .

. . . .

"NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, KANSAS:

"Section 1. Referendum Called. In accordance with the authority granted the Board by K.S.A. 19-101 et seq., an advisory referendum is hereby called and shall be held in Douglas County, Kansas on Tuesday, November 6, 1990 . . . .

"Section 2. Ballot Proposition. The vote at said advisory referendum shall be by ballot, and the proposition shall be printed on the ballot, together with the explanatory statement contained below, in substantially the following form along with any voting instructions as required by law:

"Shall the following be adopted:

"Shall Douglas County, Kansas spend the remaining proceeds of its August 5, 1986 general obligation bond issue in the original amount of $4,000,000 and approximately $722,900 in other County revenues from state motor fuel tax receipts or other lawfully available sources to match approximately $37,062,000 in federal, state and Kansas Turnpike Authority financial commitments to construct the South Lawrence Trafficway project, a limited access, two-lane highway of approximately 14 miles in length located south and west of the City of Lawrence in Douglas County, with two additional lanes of right-of-way for future expansion and interchanges at major intersections, all at a total estimated cost of $41,785,000, all being pursuant to the provisions of K.S.A. 19-101a et seq., as amended.

" 'Explanatory statement. This proposal deals with County funding for the South Lawrence Trafficway project. It asks whether the approximately $3.6 million in proceeds remaining from Douglas County's $4 million general obligation bond issue in 1986 for the South Lawrence Trafficway should be spent along with approximately $722,900 of other County funds to match $37,062,000 in grants and other financial commitments from the federal government, state government, and Kansas Turnpike Authority to construct the South Lawrence Trafficway at an estimated total cost of $41,785,000.

" 'If a majority of votes are cast in favor of the proposal, Douglas County will spend the remaining bond proceeds and other funds to construct the South Lawrence Trafficway. *Taxes will not be increased to pay for the 1986 bonds* and no additional bonds will be issued for the South Lawrence Trafficway project described in the proposal.

" 'If the majority of votes are cast in opposition to the proposal, the 1986 bond proceeds and other County funds will not be spent on the South Lawrence Trafficway, and Douglas County will not qualify for the $37,062,000 in federal, state and Kansas Turnpike Authority matching funds pledged to the project. In such event, Douglas County will retire approximately $3.6 million of the 1986 general obligation bonds at an estimated total cost of $3,734,179. This cost will be paid from the remaining bond proceeds *plus an estimated $124,871 in additional property taxes and other County revenues.' "* (Emphasis added.)

On November 6, 1990, the voters of Douglas County approved the spending of the bond proceeds. The question used on the ballot was the same as that adopted in the county resolution. After the election, the plaintiffs filed suit, alleging the ballot question was biased and misleading. Specifically, the plaintiffs contended the ballot question falsely claimed that taxes would not be increased when, in fact, they already had been raised by

$230,000 per year to pay for the bonds. Furthermore, the plaintiffs argued the ballot gave the impression that retiring the bonds would cost over $124,000 the year they were retired and every year thereafter.

The County moved to dismiss the suit, pursuant to K.S.A. 1991 Supp. 60-212(b)(6), arguing the petition failed to state a claim upon which relief could be granted and failed to state an actual case or controversy. The district court dismissed the suit and stated in pertinent part:

"Plaintiffs agree that the Supreme Court in *Blevins v. Hiebert,* 247 Kan. 1, did not require that the SLT [South Lawrence Trafficway] bonds be put to a vote. However, plaintiffs argue that the statements by Douglas County as to the binding effect of the proposed election to the Kansas Supreme Court in requesting reconsideration of the initial *Blevins* decision, estops or precludes Douglas County from denying that the election is binding. Plaintiffs contend that legal arguments were waived by Mr. Blevins at the rehearing before the Supreme Court because he took Douglas County at its word that an election would determine whether or not the SLT would continue. Plaintiffs further argue that these concessions may have impacted the final *Blevins* decision.

"To decide Douglas County's Motion to Dismiss, this court looks to the opinion of the Supreme Court. Nothing in the final *Blevins* opinion indicates that the Supreme Court was persuaded to change its ruling by the decision of Douglas County to hold an election. . . . It is important to note that the final *Blevins* decision did not limit itself to the SLT issue. If it had, plaintiffs' estoppel argument would carry greater weight. The decision, rather, applies to all cities and counties in the State who relied on the dicta of previous Supreme Court decisions in issuing general obligation bonds under the home rule authority. There is no indication that any of these 'cities and counties' promised to hold a bond election and be bound by it.

"There is no question that Douglas County promised Leslie W. Blevins, Sr., an election on the SLT bond question. However, this court can find no legal authority to support plaintiffs' argument that this type of promise makes invalid and unlawful what the Kansas Supreme Court has declared to be valid and lawful. Assuming, for the sake of argument, that after the final *Blevins* decision Douglas County reneged on its promise to Mr. Blevins to hold an election, the SLT bonds would still be valid under the *Blevins* decision. *This type of promise was political, not contractual; and, therefore, this Court cannot enjoin Douglas County from spending these funds."* (Emphasis added.)

On appeal, the Court of Appeals found Blevins, Miller, and Boyer arguably had standing pursuant to K.S.A. 60-907 and that Blevins could also have standing under an implied contract the-

ory. Slip op. at 18. The Court further held that whether the County has a right to spend the bond proceeds even if the majority of voters had disapproved was a question of fact and would have to be determined on remand. Slip op. at 22. The Court of Appeals stated:

"We are uncertain what the trial judge meant when he said the promises of County officials were 'political, not contractual.' If the holding of the trial judge is interpreted to say that the County could not, as a matter of law, be estopped to deny the binding nature of the election, the court is misinformed." Slip op. at 17.

The Court of Appeals also found the nature and meaning of the county commissioners' statements were questions of fact which had not yet been determined. We accepted review.

We are asked to determine whether the district court erred when it granted the County's motion to dismiss upon finding the plaintiffs did not have standing pursuant to K.S.A. 60-907 and had failed to state a claim.

When a trial court has sustained a motion to dismiss, our scope of review is as follows:

" 'When a motion to dismiss under K.S.A. 60-212(b)(6) raises an issue concerning the legal sufficiency of a claim, the question must be decided from the well-pleaded facts of plaintiff's petition. The motion in such case may be treated as the modern equivalent of a demurrer.' Syl. ¶ 1.

" 'Disputed issues of fact cannot be resolved or determined on a motion to dismiss for failure of the petition to state a claim upon which relief can be granted. The question for determination is whether in the light most favorable to plaintiff, and with every doubt resolved in plaintiff's favor, the petition states any valid claim for relief. Dismissal is justified only when the allegations of the petition clearly demonstrate plaintiff does not have a claim.' Syl. ¶ 2.

" 'In considering a motion to dismiss for failure of the petition to state a claim for relief, a court must accept the plaintiff's description of that which occurred, along with any inferences reasonably to be drawn therefrom. However, this does not mean the court is required to accept conclusory allegations on the legal effects of events the plaintiff has set out if these allegations do not reasonably follow from the description of what happened, or if these allegations are contradicted by the description itself.' Syl. ¶ 3."
Bruggeman v. Schimke, 239 Kan. 245, 247, 718 P.2d 635 (1986) (quoting Knight v. Neodesha Police Dept., 5 Kan. App. 2d 472, Syl. ¶¶ 1-3, 620 P.2d 837 [1980]).

The plaintiffs contend they have standing pursuant to K.S.A. 60-907, which provides in pertinent part:

"(a) *Illegal tax, charge or assessment.* Injunctive relief may be granted to enjoin the illegal levy of any tax, charge or assessment, the collection thereof, or any proceeding to enforce the same.

"(b) *Unauthorized contracts.* Injunctive relief may be granted to enjoin any public officer, board, or body from entering into any contract or doing any act not authorized by law that may result in the creation of an additional levy of a tax, charge or assessment."

The plaintiffs contend, and the Court of Appeals agreed, the test for standing under K.S.A. 60-907 was whether a taxpayer's pocketbook was affected by county action. See *Tripp v. Board of County Comm'rs,* 188 Kan. 438, 440, 362 P.2d 612 (1961). Standing, however, must fit within the two broad categories listed in K.S.A. 60-907. We find only K.S.A. 60-907(a) is applicable to this case.

In light of our decision in *Blevins II,* the Plaintiffs cannot now claim the bonds create an illegal tax, charge, or assessment. As noted above, we held "all general obligation bonds and temporary notes authorized or issued under home rule powers prior to the date of this opinion [July 13, 1990] are hereby declared *lawful and validated* as to the home rule issue." 247 Kan. at 14. The plaintiffs further claim that our validation of the bonds simply sets the stage for this litigation and that the plaintiffs may still challenge the county's authority and right to spend the proceeds of these bonds absent voter approval in a fair election.

This leads us to the question of whether the County was required to conduct a binding election regarding the spending or retirement of these bonds, as a matter of law. Counties may only hold binding elections in accordance with statutory authority set out by the legislature. K.S.A. 1991 Supp. 19-101a(7). As we discussed in *Blevins II,* the South Lawrence Trafficway project falls under the Arterial Highway Act, K.S.A. 68-580 *et seq.* K.S.A. 68-584 provides in part:

"No bonds shall be issued under this section until the question of the issuance of the bonds is submitted to a vote of the electors of the county or city at a regular or special election called for that purpose and a majority of those voting on the question shall have voted in favor of the issuance of the bonds."

This requirement of a binding election before issuing the bonds for the South Lawrence Trafficway was the crux of the issue in

*Blevins I* and *Blevins II*. Upon finding the County had failed to follow the proper procedure, we held our statement of the rule would be applied prospectively only and that the bonds for the South Lawrence Trafficway were lawful and valid. Hence, the County was not required to hold an election pursuant to K.S.A. 68-584, and furthermore had no statutory authority to hold a *binding* election.

The County's authority, however, to hold an advisory election is derived from K.S.A. 1991 Supp. 19-101a, which provides the Board of County Commissioners "may transact all county business and perform all powers of local legislation and administration it deems appropriate." An advisory election "is merely an election at which the views of a particular electorate are solicited through the balloting process with respect to a specific issue or question, and the expression of such views has *no binding effect* upon the governing body soliciting such opinion." (Emphasis added.) Att'y Gen. Op. No. 79-44, at 2.

The plaintiffs contend the County is estopped from claiming it did not have the statutory authority to hold a binding election. For support, the plaintiffs cite several cases in which this court has found rules of estoppel can be applied to municipal corporations. For example, in *Lines v. City of Topeka*, 223 Kan. 772, Syl. ¶ 5, 577 P.2d 42 (1978), we stated: "Within the scope of its power and authority to act, a municipal corporation is subject to rules of estoppel in those cases wherein justice and equity require their application and where such application will not interfere with the proper exercise of governmental functions." See *Cole v. City of Kanopolis*, 159 Kan. 304, 153 P.2d 920 (1944); *Derby Oil Co. v. City of Oxford*, 134 Kan. 59, 4 P.2d 435 (1931). In all these cases, however, the municipal corporations had the "power and authority to act" in order to perform the promises made which gave rise to the issue of estoppel.

Here, the County did not have the power and authority to call a binding election. Plaintiffs claim the statements made regarding holding an election created an implied contract to follow through with that promise. If a municipal corporation enters into a contract it has no power to make, it is ultra vires and unenforceable and no further inquiry into the contract's validity is necessary. 10 McQuillin, Municipal Corporations § 29.02 (3d ed. rev. 1990).

"Contracts which a municipal corporation is not permitted legally to enter into are not subject to ratification, and a city may not be estopped to deny the invalidity of a contract that is ultra vires in the sense that it is not within the power of the municipality to make. In other words, no ratification or estoppel can make lawful a municipal contract which is beyond the scope of the corporate powers, or which is not executed in compliance with mandatory conditions prescribed in the charter or statutes, or which is contrary to a declared policy adopted to protect the public. The notice imputed to all persons dealing with a municipal corporation of the limits of its powers, is in some cases advanced as the reason upon which these rules are based.

. . . .

"The fact that the other party to the contract has fully performed its part of the agreement, or has expended money in reliance of its validity, does not estop the city from asserting ultra vires, nor is a municipality estopped to aver its incapacity to make a contract because it received benefits under it. That is, it cannot be made liable either on the theory of estoppel or implied contract, where it had no capacity to make the contract or where it was made in express violation of law." 10A McQuillin, Municipal Corporations § 29.104.30 (3d ed. rev. 1990).

This rule has been applied in this state as well as other jurisdictions. In *Miller v. U.S.D. No. 470*, 12 Kan. App. 2d 368, 744 P.2d 865 (1987), *aff'd* 242 Kan. 817, 752 P.2d 113 (1988), the Court of Appeals addressed the issue of whether a school board may, by a collectively negotiated contract, restrict its right to terminate a nontenured teacher. The court noted school districts are creations of the state legislature and, thus, school districts only have the power to contract given them by the legislature. The court stated:

"A municipal corporation cannot bind itself by any contract beyond the scope of its powers, and anyone contracting with the corporation is deemed to know the corporate limitations in this respect. Thus, any attempt by a board of education to contract for terms violating specific statutory terms would be *ultra vires* and void." 12 Kan. App. 2d at 372.

Ultimately, the Court of Appeals held the defendant school district had overstepped its power to contract and, therefore, it had the authority to terminate a nontenured teacher without notice despite a provision to the contrary in the teacher's collectively negotiated contract. 12 Kan. App. 2d at 374. See *Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, Syl. ¶ 8, 479 P.2d 875 (1971).

In *Marco Dev. Corp. v. City of Cedar Falls*, 473 N.W.2d 41 (Iowa 1991), the City signed an agreement which, according to Marco, obligated the City to widen a street adjacent to a shopping mall Marco proposed to build. Following the election of a new mayor, the City decided not to follow through on widening the street. Marco sued the City for breach of contract but the district court ruled the contract was ultra vires on the part of the City and granted the City's summary judgment motion. On appeal, the Iowa Supreme Court noted a city may not contract for the performance of its governmental functions. The court explained:

"One who contracts with a city is bound at his peril to know the authority of the officers with whom he deals, and a contract unlawful for lack of authority, although entered [into] in good faith, creates no liability on the part of the city to pay for it, even in *quantum meruit*." 473 N.W.2d at 43.

The Iowa Supreme Court held the contract to be ultra vires and void and, hence, affirmed the district court. 473 N.W.2d at 44. See *P.C.B. Partnership v. City of Largo*, 549 So. 2d 738 (Fla. Dist. App. 1989) (city has no authority to enter into a contract which effectively contracts away the exercise of its police power); *Shopping Center v. Town of Madison*, 45 N.C. App. 249, 262 S.E.2d 705 (1980) (because the municipality was without power to contract, the alleged contract was ultra vires and unenforceable).

Considering all the facts in a light most favorable to the plaintiffs, we hold the plaintiffs have failed to state a claim upon which relief can be granted. Assuming the plaintiffs relied upon the county commissioners' statements that the County would be bound by the election, the election was, as a matter of law, merely advisory. As the trial court noted, even if the County had reneged on its promise to Blevins to hold an election, the bonds would still be valid under our decision in *Blevins II*. Because the County could not contract to hold a binding election, any promises regarding the election were political and not contractual. The proper forum for the plaintiffs to express dissatisfaction with the advisory election process is in the voting booth.

Both parties raise other issues, which need not be addressed in light of our decisions regarding standing and the plaintiffs' failure to state a claim; however, with respect to the county officials making false statements on the ballot explanation, we are

impelled to state we find nothing false or misleading in the statement.

The judgment of the district court is affirmed, and the judgment of the Court of Appeals is reversed.

SIX, J., not participating.