The Honorable Carl D. Holmes State Representative, 125th District P.O. Box 2288 Liberal, Kansas 67905
Dear Representative Holmes:
As Representative for the One-Hundred Twenty-Fifth District, you request our opinion concerning corporate farming and the Agricultural Corporations Act, K.S.A.17-5902 et seq. Specifically, your questions concern the power of a board of county commissioners to rescind a resolution passed pursuant to K.S.A. 17-5908, a county's authority to enact environmental standards on agricultural land and whether a county may zone agricultural land. In addition, you ask that we discuss the impact and potential liability of the county in exercising any such actions, and to explain the feedlot and nonfarming exemptions to the state prohibition against the corporate ownership of farmland.
Seward County Counselor, J. Douglas Miller, has informed us that on April 25, 1994, the Seward County Board of Commissioners passed Resolution No. 94-13 to permit corporate swine production in Seward County. The resolution was not protested and has been in effect since 60 days after its final publication. On July 21, 1997, the Board of County Commissioners of Seward County passed Charter Resolution No. 97-3 pursuant to K.S.A. 19-101b
to rescind Resolution No. 94-13. The Board of County Commissioners has scheduled a vote of the electorate on September 16, 1997. The proposition on the ballot will be, "Shall Charter Resolution No. 97-3 take effect to prohibit corporate swine production in Seward County, Kansas rescinding previous Resolution 94-13."
Rescission Issues
1. "Does any board of county commissioners have the authority to rescind a resolution previously adopted?"
In Attorney General Opinion No. 96-21 this office opined that a county may use its power of home rule to rescind a resolution previously adopted pursuant to K.S.A. 17-5908. We continue to believe that counties have that power and affirm the conclusions reached in Opinion No. 96-21.
2. "Does any board of county commissioners have the authority to put this issue on the ballot and to make the rescission of the resolution contingent upon the outcome of the vote?"
Although your question is couched in general terms, we limit our discussion and opinion to the facts we have been provided concerning corporate swine production resolutions in Seward County rather than attempting to address every conceivable scenario.
The Kansas Supreme Court in Blevins v. Board ofDouglas County Commissioners, 251 Kan. 374, 382 (1992), stated that "[c]ounties may only hold binding elections in accordance with statutory authority set out by the legislature. K.S.A. 1991 Supp. 19-101a(7)." The Court concluded that K.S.A. 19-101a, which sets out the home rule powers of counties, does not give a county the power and authority to call a binding election. However, a county may hold an advisory election pursuant to K.S.A. 19-101a, which authorizes the Board of County Commissioners to "transact all county business and perform all powers of local legislation and administration it deems appropriate." Id., at 383.
 "An advisory election `is merely an election at which the views of a particular electorate are solicited through the balloting process with respect to a specific issue or question, and the expression of such views has no binding effect upon the governing body soliciting such opinion.'" Id., citing Attorney General Opinion No. 79-44.
Even though the Board of County Commissioners of Douglas County inBlevins agreed publicly to be bound by the results of an advisory election, the Court determined that since the County did not have the power to call a binding election it was without power to enter into an implied contract to be bound by the election. "Because the County could not contract to hold a binding election, any promises regarding the election were political and not contractual." Id., at 385.
While a county does have statutory authority to hold a binding election when adopting a charter resolution, a charter resolution is not the appropriate mechanism to rescind a resolution permitting corporate farming under K.S.A. 17-5908. K.S.A. 1996 Supp. 19-101a (b) states in pertinent part that:
 "Counties shall apply the powers of local legislation granted in subsection (a) by resolution of the board of county commissioners. . . . If the legislation proposed by the board under authority of subsection (a) is contrary to an act of the legislature which is applicable to the particular county but not uniformly applicable to all counties, such legislation shall become effective by passage of a charter resolution in the manner provided in K.S.A. 19-101b, and amendments thereto."
K.S.A. 19-101b(b) provides in part as follows:
 "A charter resolution is a resolution which exempts a county from the whole or any part of an act of the legislature and which may provide substitute and additional provisions on the same subject. Such charter resolution shall be so titled, shall designate specifically the act of the legislature or part thereof made inapplicable to such county by the passage of the resolution and shall contain any substitute and additional provisions."
In rescinding a resolution passed pursuant to K.S.A.17-5908, a county is not exempting itself from any act of the legislature and therefore an ordinary home rule resolution rather than a charter resolution is the proper vehicle for exercising the county's home rule power. Thus, in the absence of statutory authority to call a binding election, it is our opinion that the election in Seward County on September 16, 1997, will be a non-binding advisory election. If the Board of County Commissioners of Seward County wishes to rescind its previously passed resolution, it should do so by passing an ordinary home rule resolution.
While K.S.A. 19-101b is cited as one of the home rule statutes in Attorney General Opinion No. 96-21, that opinion concludes that K.S.A. 17-5908 applies uniformly to all counties. K.S.A. 19-101b, concerning charter resolutions, is indeed one of the home rule statutes, but it is not the statute applicable for rescinding a resolution previously passed pursuant to K.S.A. 17-5908.
3. "Given facts similar to the following, please advise whether a county has any liability to a corporation if the county rescinds a previously adopted resolution permitting corporate ownership of agricultural land for use as a swine production facility. Facts: A corporation has purchased multiple tracts of agricultural land as part of its overall development plan to construct swine production facilities as permitted by the resolution in effect. Construction will have commenced on some, but not all of such facilities. The corporation may or may not have invested thousands of dollars in engineering fees, surveyors [sic] fees and preliminary site work."
Because liability depends on the specific facts of each situation, liability issues are best decided by a court after an evidentiary hearing and consideration of all of the relevant facts. Unlike a court, this office in drafting opinions does not have the opportunity to discover all of the pertinent facts necessary to determine liability issues. Therefore, any opinion we provide regarding liability would be speculative and potentially misleading. Nevertheless, in an effort to provide some guidance to counties in assessing their potential liability, Attorney General Opinion No. 96-21
addressed possible impacts of rescinding a previously passed resolution permitting corporate farming. We direct your attention to that opinion for questions regarding liability that a county may possibly incur after rescinding its corporate farming resolution. Additionally, we note that allowing the continuation of already existing swine production facilities by grandfathering may possibly alleviate some of the potential liability.
4. "How could agricultural land initially acquired by a corporation pursuant to the swine production facility exemption set forth in K.S.A. 17-5908 [be] use[d] if a county rescinds such exemption?"
If the county does not provide for the grandfathering of any existing corporate farming operations, and if the corporation retains ownership of the land, the land could only be used for a purpose that conforms to one of the exceptions listed in K.S.A. 1996 Supp. 17-5904(a)(1) through (17). If the county provides a grandfather provision, the use would depend on the terms of that provision.
5. "If a corporate swine production facility legally existed before the favorable passage of a resolution and then the resolution is rescinded, can the `grandfathered' operating facility constructed before passage of 17-5904(a)(15) continue to operate? What is the status of land purchased during the time the resolution permitted corporate swine production?"
K.S.A. 1996 Supp. 17-5904(a)(7) provides that agricultural land owned or leased by a corporation on the effective date of the Agricultural Corporations Act is excepted from the Act, "provided such entity shall not own or lease any greater acreage of agriculturalland than it owned or leased prior to the effective dateof this act unless it is in compliance with theprovisions of this act." (Emphasis added.) This grandfather clause excepts any land owned on the effective date of the Act from the provisions of the Act. Therefore, land owned on the effective date of the Act is not subject to the Act. Whether or not a county rescinds its resolution permitting corporate swine production has no effect on the grandfathered land. See
Attorney General Opinions No. 84-38 and 84-47.
The second part of your question concerns additional land purchased by the corporation after the effective date of the Act, but prior to the rescission of the county resolution permitting corporate swine production. K.S.A. 1996 Supp. 17-5904(a)(7) dictates that any land purchased by the corporation after the effective date of the Act is not included in the grandfather clause and is subject to the provisions of the Act. Therefore, any land purchased after the effective date of the Act would be affected by a county resolution to rescind corporate swine production and could only be used by the corporation for one of the uses excepted by the Act or as provided in any grandfather provision established by the county.
Environmental Standards
6. "Does a board of county commissioners have the authority under Kansas law (e.g. home rule) to impose local environmental standards which are more stringent than state standards on the use of agricultural land in Kansas?"
7. "Does a board of county commissioners have the authority under Kansas law to impose local environmental standards on agricultural land used for the purpose of housing, breeding, farrowing, or feeding of swine?"
8. "In imposing such environmental standards does Kansas law obligate the board of county commissioners to grandfather from such standards those swine facilities existing or under construction? If no, then does the board of county commissioners have the authority to grandfather those swine facilities or any other animal facilities existing or under construction?"
9. "In imposing such environmental standards can the board of county commissioners discriminate between swine facilities subject to the corporate ownership restrictions set forth in K.S.A. 17-5994(a) and those not subject to such restriction?"
You preface these questions with commentary on K.S.A.65-171h and your understanding that the Kansas Department of Health and Environment (KDHE) is in the process of incorporating minimum standards for design of sanitary water and sewage systems into its administrative regulations. K.S.A. 65-171h provides as follows:
 "The secretary of health and environment in pursuance of his general power of supervision over the interests of the health and life of the citizens of this state, and the sanitary conditions under which they live and in order to protect the quality of the waters of the state for beneficial uses is hereby authorized and empowered to develop, assemble, compile, approve and publish minimum standards of design, construction, and maintenance of sanitary water and sewage systems, and shall publish and make available such approved minimum standards to municipalities, communities and citizens of this state, and shall from time to time make recommendations to the appropriate committees of the legislature, for any legislation that may be required to adequately protect air in enclosed spaces, and water supply from contamination."
This statute and K.S.A. 65-171g were the only two sections enacted by L. 1951, Ch. 363. Both statutes are uniform and thus counties have no authority to charter out of their provisions. K.S.A. 1996 Supp. 19-101a(a)(1). However, neither statute preemptively precludes counties from establishing additional standards that are more stringent than the minimum developed by the Secretary of KDHE. [We are informed by KDHE that the water pollution control permits issued by that agency pursuant to K.S.A. 65-165 et seq. contain a statement that issuance of a permit does not obviate required compliance with any other applicable laws or regulations.] In fact separate legislation invites counties to do so. K.S.A.19-3701 et seq., enacted in 1955, specifically authorizes certain counties to "by resolution adopt a sanitary code or codes to apply to such parts of the county as set forth in this act as they deem necessary, for the control of those environments and environmental conditions that adversely affect the health and well-being of the public. . . ." K.S.A. 19-3702. The term "environments and environmental conditions" is made applicable to sewerage, sewage disposal and water supply. K.S.A. 19-3701. See also K.S.A. 12-3303.
Although K.S.A. 19-3706 exempts from that Act's provisions certain lands "used only for agricultural purposes," because the Act applies only to those counties served by a local health department, it is non-uniform and thus subject to charter resolution. In other words, counties may, by home rule, charter out from all or any part of K.S.A. 19-3701 et seq., including the provision that otherwise prohibits them from applying their sanitation codes to agricultural property.
In answer to questions 6, 7 and 8, K.S.A. 65-171h does not preclude counties from imposing local environmental standards that are more stringent than the state standards promulgated by KDHE on either the use of agricultural land or land used for the purpose of housing, breeding, farrowing or feeding swine. However in doing so, a county should evaluate any proposed standards to determine the impact they may have on existing facilities. To lessen the potential for a successful governmental takings challenge, such regulations should not be arbitrary, oppressive or otherwise "go too far."
Whether a particular standard is in conflict with or prohibited by any other statute, such as K.S.A. 1996 Supp. 65-171d, must be determined by reference to the specific language of the standard and the statute, and whether the statute is part of a uniform enactment. Similarly, whether a county must or may grandfather existing swine facilities from such standards will depend on the standards and the applicable laws.
You inquire whether a board of county commissioners may treat swine facilities subject to corporate ownership restrictions set forth in K.S.A. 1996 Supp.17-5904(a) differently than those facilities not subject to such restrictions. While the Equal Protection Clause of the United States Constitution prohibits unlawful discrimination, not all disparate treatment is considered unlawful. Farley v. Engelken, 241 Kan. 663,668 (1987). In the absence of a suspect or quasi-suspect classification, such as one based on nationality, race or gender, or some fundamental right, the government need only have a rational basis for treating different types of entities differently. Id., at 669. Thus, a board of county commissioners may treat corporate facilities subject to the restrictions of K.S.A. 1996 Supp. 17-5904(a) differently than those not subject to such restrictions if there is a rational basis, one rationally related to a valid governmental interest, for doing so. See Peden v. Kansas Departmentof Revenue, 261 Kan. 239, 252 (1996). We note that the Agricultural Corporations Act itself differentiates between corporately owned farmland and land that is not corporately owned.
Zoning of Agricultural Enterprises
10. "Does a board of county commissioners have the authority to zone agricultural enterprises?"
We presume that you are questioning whether counties may zone land used for agricultural purposes. K.S.A.12-758, as amended by L. 1997, Ch. 147, § 9, and 19-2921 limit zoning within counties and K.S.A. 19-2908 limits zoning within certain townships. All of these statutes contain substantially the following language:
 "Except for flood plain regulations in areas designated as a flood plain, regulations adopted by . . . a county pursuant to this act shall not apply to the use of land for agricultural purposes, nor for the erection or maintenance of buildings thereon for such purposes so long as such land and buildings are used for agricultural purposes and not otherwise." K.S.A. 12-758(b), as amended. See also K.S.A. 19-2960.
Attorney General Opinion No. 85-39 considered whether counties may use home rule authority to exempt themselves from K.S.A. 19-2921 and concluded that they could not because the statute was uniformly applicable to all counties.
In Corbet v. Board of Shawnee County Commissioners,14 Kan. App. 2d 123, 125-126 (1989), the court considered the definition of "agricultural purpose" and stated:
 "No Kansas case has specifically defined what an `agricultural purpose' is under 19-2921. Several cases have considered whether certain activities fall within that term. See Fields v. Anderson Cattle Co., 193 Kan. 558, 563-64; 396 P.2d 276 (1964) (agricultural purpose includes operation of livestock feed lots); Carp v. Board of County Commissioners, 190 Kan. 177, 373 P.2d 153 (1962) (agricultural purpose includes a hog feeding operation). . . ."
Attorney General Opinion No. 91-97 discussed zoning regulations in relation to the proscription against corporate ownership of agricultural land and opined that "[a]lthough counties and townships are authorized by statute to regulate land use by zoning, zoning does not prevent the use of land for agricultural purposes. Zoning regulations control only when agricultural uses are abandoned. Board of County Commissioners v. Brown,183 Kan. 19 (1958); Blauvelt v. Board of CountyCommissioners, 227 Kan. 110 (1980)."
Separation Distances
11. "Does a board of county commissioners have the authority through zoning or any other power to impose a greater separation distance between confined feeding facilities and habitable structures than the distances set forth in K.S.A. 1996 Supp. 65-171d(h)?"
12. "What implications would there be if such greater separation distances effectively made it impossible to construct any new confined feeding facility or expand any existing facility?"
As discussed earlier, county zoning regulations do not apply to land used for agricultural purposes. Although there are no Kansas cases that have decided whether a confined feeding facility is an agricultural use for zoning purposes, the Court has determined that the operation of livestock feedlots and hog feeding operations are agricultural purposes. See Fields,193 Kan. at 563-564; Carp, 190 Kan. at 177. Therefore, in our opinion, a county has no zoning authority to impose separation distances between confined feeding facilities.
However, K.S.A. 1996 Supp. 65-171d provides in part:
 "(a) For the purpose of preventing surface and sub-surface water pollution and soil pollution detrimental to public health or to the plant, animal and aquatic life of the state, and to protect beneficial uses of the waters of the state and to require the treatment of sewage predicated upon technologically based effluent limitations, the secretary of health and environment shall make such rules and regulations, including registration of potential sources of pollution, as may in the secretary's judgment be necessary to: . . . (2) control the disposal, discharge or escape of sewage . . . by or from municipalities, corporations, companies, institutions, state agencies, federal agencies or individuals and any plants, works or facilities owned or operated, or both, by them . . . .
 "(h) Any new construction or new expansion of a confined feeding facility shall meet or exceed the following requirements in separation distances from any habitable structure: (1) 1320 feet for facilities with an animal unit capacity of 300 to 999; and (2) 4000 feet for facilities with an animal unit capacity of 1,000 or more."
K.S.A. 1996 Supp. 65-171d, which is part of an enactment uniformly applicable to all counties [See L. 1933, Ch. 85], indicates that separation distance regulations are imposed to prevent water and soil pollution. Therefore, the same analysis and conclusions stated above for environmental standards apply to the regulation of separation distances and any grandfathering or differentiation between facilities. Counties may impose greater separation distance requirements than those established in K.S.A. 1996 Supp. 65-171d as long as the county requirements do not conflict with any uniform legislative enactments.
While any implications from imposing greater separation distances would depend on the specific terms of the county requirements, the requirements might subject the county to a challenge by the owners of an affected confined feeding facility. We direct your attention to Attorney General Opinion No. 96-21 for a discussion of what constitutes a taking by the government and whether compensation might be necessary.
Agricultural Corporations and Feedlot Exception
13. "Do you stand by Opinions No. 83-160 and No. 94-129
and [the] conclusion that swine feedlots are not subject to county approval under Kansas law?"
Although the conclusion you state in your question can be drawn from these two opinions, it is not the subject or question addressed by either of them. Both opinions concern whether feedlots may contain an incidental
breeding operation and still remain in the feedlotexemption to the prohibition against corporate ownership of farmland, K.S.A. 1996 Supp. 17-5904(a)(8).
In Attorney General Opinion No. 94-129 we explain that the difference (as defined by the Agricultural Corporations Act) between a feedlot and a swine production facility is critical because a feedlot is exempted from the prohibition against corporate ownership, while a swine production facility is not exempted unless a county chooses to authorize operation of such facilities within the county pursuant to K.S.A.17-5908. See K.S.A. 1996 Supp. 17-5904(a)(8) and (a)(15). It is our opinion that both Attorney General Opinions No. 83-160 and 94-129 are valid and that a swine feedlot is not subject to the provisions of K.S.A. 17-5908
because, unlike a swine production facility, a feedlot is exempted from the prohibition against the corporate ownership of farmland by K.S.A. 1996 Supp. 17-5904(a)(8) without reference to K.S.A. 17-5908.
14. "Is a corporate owned feedlot whose sole purpose is feeding of livestock for slaughter (cattle or swine) exempt from corporate ownership restrictions if the corporation transports the livestock fed for slaughter from breeding and nursery operations located outside Kansas or in a county which has approved corporate swine production and is geographically separated from such feeding facility? The feedlots do not have any incidental breeding or nursery operations."
A feedlot is defined in K.S.A. 1996 Supp. 17-5903(f) as:
 "a lot, yard, corral, or other area in which livestock fed for slaughter are confined. The term includes within its meaning agricultural land in such acreage as is necessary for the operation of the feedlot."
There is no requirement in this definition regarding the source of the livestock. Thus, in our opinion, a feedlot otherwise exempted from the prohibition against corporate ownership of farmland by K.S.A. 1996 Supp.17-5904(a)(8), does not change its character as a feedlot merely by obtaining its livestock from outside the State or from outside the county. The feedlot, however, may not contain a breeding operation in order to supply its livestock because the feedlot facility then becomes [by definition at K.S.A. 1996 Supp. 17-5903(s)] a swine production facility which is not exempted from the prohibition unless a county, by resolution, lifts the prohibition. See Attorney General Opinion No.94-129.
Agricultural Corporations and the Nonfarming Exception
15. "Do finishing facilities qualify for the nonfarming exemption set forth in K.S.A. 17-5904 (a)(3) to the restrictions on corporate ownership of agricultural land?"
The exemption in question applies to:
 "Agricultural land acquired by a corporation or a limited liability company in such acreage as is necessary for the operation of a nonfarming business. Such land may not be used for farming except under lease to one or more natural persons, a family farm corporation, authorized farm corporation, family trust, authorized trust or testamentary trust. The corporation shall not engage, either directly or indirectly, in the farming operation and shall not receive any financial benefit, other than rent, from the farming operation."
In order to qualify for the non-farming exemption the corporation cannot be engaged in farming as defined by K.S.A. 1996 Supp. 17-5903(h):
 "`Farming' means the cultivation of land for the production of agricultural crops, the raising of poultry, the production of eggs, the production of milk, the production of fruit or other horticultural crops, grazing or the production of livestock. Farming does not include the production of timber, forest products, nursery products or sod, and farming does not include a contract to provide spraying, harvesting or other farm services."
A "finishing facility" is one where livestock are fed or "finished" for slaughter and otherwise comprises a feedlot. See Pork Motel, Corp. v. Kansas Department ofHealth and Environment, 234 Kan. 374, 376 (1983). Assuming that the finishing facility in question is a commercial feedlot which has no breeding operation, incidental or otherwise, it does not appear to be engaged in farming as defined in K.S.A. 1996 Supp.17-5903(h). See T-Bone Feeders, Inc. v. Martin,236 Kan. 641, 648,649 (1985) (discussion on the distinction between a commercial feedlot and farming; a feedlot is a specialized agri-business engaged in an agricultural endeavor but is not engaged in farming for purposes of a tax exemption on farming equipment). We note for purposes of avoiding confusion that a feedlot is already exempted from the prohibition against corporate ownership of farmland pursuant to K.S.A. 1996 Supp. 17-5904(a)(8).
In conclusion, until the Legislature repeals or amends K.S.A. 17-5908 to provide otherwise, counties' authority to regulate corporate swine production facilities is determined by general principles regarding home rule, zoning and establishment of environmental standards as discussed herein. Regulation of corporate feedlots is subject to relevant provisions in the Agricultural Corporations Act.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Donna M. Voth Assistant Attorney General
CJS:JLM:DMV:GE:jm