No. 97,486

GENESIS HEALTH CLUB, INC., GENESIS HEALTH CLUBS MANAGEMENT, LLC, and STEVEN ENTERPRISES, LLC, all d/b/a GENESIS HEALTH CLUBS, *Appellants*, v. CITY OF WICHITA, *Appellee*.

(181 P.3d 549)

Opinion filed March 28, 2008.

*Ken M. Peterson*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Richard A. Kear*, of the same firm, was with him on the briefs for appellants.

*Arthur S. Chalmers*, of Hite, Fanning & Honeyman, L.L.P., of Wichita, argued the cause, and *Randy J. Troutt*, of the same firm, and *Gary Rebenstorf*, Wichita City Attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Genesis Health Club, Inc., *et al.*, (Genesis), sued the City of Wichita (City) for failure to issue Industrial Revenue Bonds (IRBs) and for failure to grant ad valorem property tax abatements pursuant to an alleged contract between these parties. Its causes of action were for breach of contract and promissory estoppel. The district court granted the City's motion for summary judgment, essentially holding that the City lacked the power to enter into such

a contract. Genesis appeals, and the City cross-appeals. We transferred the case from the Court of Appeals pursuant to K.S.A. 20-3017.

The parties present a number of issues on appeal, which we reduce as follows:

1. Was the July 23, 2004, letter of intent a binding contract between the parties? No.

2. Even though no binding contract exists, does promissory estoppel nevertheless prevent the City from refusing to issue the IRBs and to grant ad valorem property tax abatements? No.

Accordingly, the judgment of the district court is affirmed, albeit for slightly different reasons.

## FACTS

The parties take no real exceptions to the district court's "uncontroverted facts" contained in its Journal Entry of Judgment:

"1. Genesis Health Club, Inc., Genesis Health Club Management, LLC, and Steven Enterprises, L.L.C. are Kansas legal entities all doing business, in Kansas, as 'Genesis Health Clubs.'

"2. The City of Wichita, Kansas ('City') is a municipal corporation, a city of the First Class.

"3. On or about June 18, 2004, Genesis Health Club Management, LLC requested approval by the governing body of the City of a 'Letter of Intent' to issue Taxable Industrial Revenue Bonds (IRBs) in an amount not to exceed $11,850,000, to finance the cost of acquiring, constructing and equipping three health club facilities to be leased to Genesis Health Club Management, LLC. The location of three health club facilities were identified as (1) 'the core area of Wichita at either 3725 W. 13th or Riverside Tennis Center', (2) 'one in west Wichita at the northwest corner of 29th and Maize Road', and (3) 'its existing health club at 854 N. Socora.'

"4. On July 2, 2004, the Center for Economic Development and Business Research, W. Frank Barton School of Business, Wichita State University, faxed to Lisa Jones, of the City's staff, a 'state-required cost-benefit analysis' of the Initial Genesis Proposal. That analysis did not consider the impact on the Maize School District, USD 266. The language 'state required cost benefit analysis' is a statement by a lay person.

"5. Correspondence dated July 2, 2004 was mailed to the Sedgwick County Clerk and the Clerk of the Board of Education of Unified School District 259 [Wichita] by the City's staff, stating:

'This is to notify you pursuant to K.S.A. 12-1749c and K.S.A. 12-1749d, that at its regular meeting at 9:00 a.m. on July 13, 2004, at City Hall, 455 N. Main, Wichita, Kansas, the governing body of the City will consider for public discussion the issuance of [1] not to exceed $11,850,000 principal amount of Taxable Industrial Revenue Bonds under K.S.A. 12-1740 et seq., [2] as well as an accompanying ad valorem property tax exemption for the property purchased with the proceeds of said Bonds. The property to be purchased with the proceeds of said Bonds will be leased to Genesis Health Clubs Management, LLC, and will be located within the territorial boundaries of Sedgwick County, Kansas, and Unified School District No. 259, Wichita, Kansas.'

"6. The City caused to be published on July 6, 2004, in the Wichita Eagle, the following 'Notice of Public Hearing for Issuance of Taxable Industrial Revenue Bonds and Granting an Ad Valorem Tax Abatement':

'Public notice is hereby given that the governing body of the City of Wichita, Kansas, (the 'City'), will conduct a public hearing in connection with the proposed issuance by the City of Wichita, Kansas, of its Taxable Industrial Revenue Bonds, in an aggregate principal amount not to exceed $11,850,000 on Tuesday, July 13, 2004, or at such later time as shall be established by the governing body during said meeting, at City Hall, 455 N. Main, Wichita, Kansas 62702. Said Taxable Industrial Revenue Bonds are proposed to be issued by the City for the purpose of providing funds to acquire, construct, and equip three health club facilities, variously located at 3725 W. 13th, the corner of 29th and Maize Road, and 854 N. Socora, in the City of Wichita, Kansas (the 'Project').

'Said Taxable Industrial Revenue Bonds, which include an accompanying ad valorem property tax exemption, are proposed to be issued under authority of K.S.A. 12-1740 to 12-1749d, as amended.

'The City further intends to lease the Project to Genesis Health Clubs Management, a Limited Liability Corporation.

'A copy of this Notice, along with a copy of the letter of intent and the proposed ordinance authorizing the governing body of the City to issue such Taxable Industrial Revenue Bonds, is on file in the office of the City Clerk and is available for public inspection during normal business hours. In the event said taxable industrial revenue bonds are not ultimately issued for any reason, the City of Wichita, Kansas, shall not be deemed to have assumed or incurred any liability or obligation to Genesis Health Clubs or any other party by virtue of any proceedings or actions taken in connection therewith.

'All persons having an interest in this matter will be given an opportunity to be heard at the time and place specified.

'The governing body of the City will not adopt an Ordinance authorizing the issuance of such Taxable Industrial Revenue Bonds and thereby approving the accompanying tax abatement until the passage of seven (7) days from the date this Notice is published in the official city newspaper of the City of Wichita, Kansas and until said public hearing is conducted.'

"7. On or about July 12, 2004, Genesis Health Club Management, LLC revised its requested approval by the governing body of the City of a 'Letter of Intent' to issue Taxable Industrial Revenue Bonds (IRBs) in an amount not to exceed $11,850,000, to finance the cost of acquiring, constructing and equipping three health club facilities to be leased to Genesis Health Club Management, LLC. The three health club facilities were identified in the correspondence as (1) 'the core area of Wichita at 3725 W. 13th,' [deleting the former alternative of "Riverside Tennis Center"] (2) 'one in west Wichita at the northwest corner of 29th and Maize Road', and (3) 'its existing health club at 854 N. Socora.'

"8. On July 13, 2004, at the regularly scheduled governing body meeting, five members of the City Council of the City voted to: 'approve a one-year Letter of Intent to Genesis Health Clubs for Industrial Revenue Bonds in an amount not-to-exceed $11,850,000, subject to the Standard Letter of Intent Conditions, authorize staff to select a bond counsel based on competitive fee quotes; determine the amount of tax abatement to be 50% for five-years and Council wishes to approve bond-financed property for the initial five-year period plus a renewal and that there will be a payment in lieu of taxes on the difference on the 2003 payment on the taxes on the properly [sic] at West 13th Street and that the necessary signatures be authorized.'

"9. The City did not send the governing body of the Unified School District No. 266, Maize, Kansas written notice of either the Initial Genesis Proposal or the Revised Genesis Proposal [dated June 18 and July 12 respectively] until after the July 13 meeting described in the previous paragraph. However, on July 13, 2004, the health club facility that was to be located under both projects 'at the northwest corner of 29th and Maize Road' was within the territorial boundaries of Unified School District No. 266.

"10. The site for the health club facility to be located at the northwest corner of 29th and Maize Road was not within the territorial boundaries of the City, although it was located in Sedgwick County. However, the only written notice, which the City provided to Sedgwick County concerning either the Initial Genesis Proposal or the Revised Genesis Proposal before July 13, 2004, is that described in paragraph 5 above. Then, in May of 2005, the property in question was annexed by the City.

"11. A Letter of Intent with attached 'City of Wichita, Kansas Standard Letter of Intent Conditions', dated July 13, 2004, was provided by the City to Genesis [hereafter 'Letter of Intent.']. The letter provided, in part:

'In accordance with the action taken at its regular meeting held on July 13, 2004, the City Council of the City of Wichita, Kansas, hereby tenders its written intent to issue Industrial Revenue Bonds in an amount not-to-exceed $11,850,000. This intent to issue bonds will remain in effect for a one-year term, ending July 13, 2005.

'Pursuant to your application dated June 18, 2004, proceeds will be used to construct and equip two health club facilities, one in the core of Wichita at 3725

W. 13th, one in the northwest corner of 29th and Maize Road, and expand its existing health club at 854 N. Socora.

'In addition, the City Council approved a 50 % abatement on all bond-financed property for a term of five years, plus an additional five years subject to City Council review. The company will also make payment in lieu of taxes based on the 2003 value of the Genesis property located on West 13th Street.

'Please sign and return one original letter to the Department of Finance. You may retain the second original for your records. . . .'

"12. On or about July 26, 2004, Genesis' representative signed the Letter of Intent.

"13. On June 21, 2005, a motion at the City Council's regular meeting to extend the July 13, 2004 Letter of Intent's one year deadline failed. The Motion was requested by City Staff.

"14. Thereafter, Genesis requested the City to 'draft bond documents and put it on the City Council Agenda before July 13, 2005 (the expiration date of the Letter of Intent), [but] this did not occur and the City Council never even voted on whether to issue IRBs before the expiration of the Letter of Intent.'

"15. The City never passed an ordinance authorizing the issuance of revenue bonds.

"16. The notices sent out prior to the City entering into the Letter of Intent were incomplete as notice was not provided to Maize School District, within which one of the three tracts of land involved was located.

"17. K.S.A. §12-1749c provides, in part, that 'the city clerk . . . shall notify in writing the governing board of the unified school district within which the property proposed for exemption is located.'

"18. K.S.A. §12-1749d provides, in part, that 'Prior to issuing any revenue bonds . . . the governing body of the city . . . shall be required to: (a) Prepare an analysis of the costs and benefits of each exemption which shall include the effect of the exemption on state revenues . . . .'

"19. The 29th and Maize Street property was annexed by the City of Wichita in May 2005.

"20. That annexation eliminated the [original] need for approval of the bond issue by Sedgwick County.

"21. The City's website, on the economic development portion maintained by Alan Bell, states that a letter of intent regarding IRBs is a 'commitment to issue the IRBs subject to negotiated conditions.'

"22. The City's Policy Resolution on IRBs in effect in July 2004 states that bonds 'will be issued following proof of satisfaction of all conditions . . . and following approval of the bond documents . . . by the City Attorney's Office and approval by the City Council (through approval and publication of the bond ordinance).'

"23. All the conditions to the Letter of Intent were either met by plaintiffs, were inapplicable, or were not met because the City stopped drafting the documents and otherwise prevented performance.

"24. The City of Wichita completed a 'Request for Project [sales tax] Exemption Certificate' that lists a 'contract date' of July 13, 2004.

"25. The July 13, 2004 date shown as the 'contract date' on the Request comes directly from the Letter of Intent the City issued to Genesis.

"26. That Request was prepared by the City of Wichita and signed by Plaintiffs and the City.

"27. That Request states that 'This agreement shall be binding upon all parties hereto and any and all their successors.'

"28. That Request signed by plaintiffs and the City was then sent by the City to the State of Kansas.

"29. The State of Kansas issued the sales tax exemption certificate.

"30. The City Council addressed the matter during its regular meeting on December 7, 2004 and determined to 'reaffirm' the Letter of Intent by a 5 to 1 vote.

"31. Plaintiffs requested that the bond issuance be placed on the agenda in June 2005.

"32. The City Council was never provided with an analysis by their law department or staff regarding whether or not Genesis had complied with the conditions attached to the Letter of Intent.

"33. The City Council never held a meeting to determine whether Genesis had met conditions attached to the Letter of Intent.

"34. The City of Wichita has recognized in its Policy Resolution on IRBs that 'The City of Wichita is authorized by K.S.A. 12-1740 to 12-1749d inclusive, as amended, to issue industrial revenue bonds.'"

Following the district court's determination of uncontroverted facts, it set forth its conclusions of law as follows:

"There are no material facts that are controverted.

"The legal issue is did the City contractually bind itself to the issuance of approximately $11.8 million of industrial revenue bonds by approving, by resolution of the city council, the letter of intent dated July 13, 2004?

"No city can issue IRBs except through the auspices of the Economic Development Revenue Bonds Act, EDRBA. Under EDRBA, a city is required to do certain things before IRBs can be issued. Those requirements include, in part: notice of public hearings; the holding of the public hearings themselves; communication with other governmental entities; cost-benefit studies; and, ultimately, approval of a bond ordinance which must include all the details of the bond issuance. Those statutory requirements are in place for the benefit and protection of the public. The Kansas Supreme Court upheld the constitutionality of the EDRBA, at least in part, because of the protections that these requirements provide to the citizenry.

"But here it is being argued by Genesis that the City bound itself to the issuance of IRBs through the letter of intent that was approved before some of the requirements of EDRBA had been complied with. As the City points out, what Genesis

is arguing is that the City's power to contract is unfettered by EDRBA's statutory requirements of notices, hearings, input from the public and other governmental entities, cost benefit studies, and factual findings, all of which must eventually culminate in passage of a bond ordinance.

"If the legislature intended that the City could become contractually bound to issue IRBs before those requirements are met, then why are those requirements part of the law? One rule of statutory construction is that it is presumed that the legislature does not enact provisions which have no purpose or meaning. By its language EDRBA does contemplate that certain of its requirements can be complied with after the approval of the letter of intent. But why would the legislature permit the cost-benefit analysis and approval by the county to take place after a letter of intent has been agreed to, if the letter of intent is meant to be the final word? Under such circumstances, such analyses and approvals would be superfluous.

"One aspect of this case that has troubled the Court from the outset is the question of reliance by Genesis. It is uncontroverted that Genesis has expended funds in the expectation of this IRB issuance. In reviewing the case law, it appears that the appellate courts have been confronted with such realities in the past, but the higher courts' rulings indicate to this Court that the making of expenditures in situations like this cannot breathe life into a nonexistent or illegal contract or ordinance. [*Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, 479 P.2d 875 (1971); *Ford v. City of Hutchinson*, 140 Kan. 307, 37 P.2d 39 (1934).] The appellate courts have ruled this way because of what is at stake as a matter of public policy. Genesis' position, sincerely held, if accepted, would create a mechanism by which meaningful review by the public and other governmental entities on IRB proposals could be circumvented.

"Genesis views itself in this case as making the government more accountable for its actions and the Court empathizes with Genesis in that regard. But if Genesis prevails and the precedent is set that the City can enter into a binding contract to issue IRBs before the requirements of EDRBA have been complied with, the great irony of this case will be that by attempting to increase the City's accountability to Genesis, we will be greatly lessening that city's accountability to the public. Because if the City discovers that the requirements of EDRBA can be evaded by simply entering into a letter of intent, the City will do that every time it feels the urge. And in so doing the City will be skirting the very procedural safeguards that made it possible for the Kansas Supreme Court to find EDRBA constitutional in the first place."

The district court essentially concluded that the City lacked the power to enter into such a contract:

"The bottom line is that a city lacks the power to issue IRBs without complying with EDRBA. And if a city lacks the power to issue those IRBs without complying with EDRBA, it certainly lacks the power to enter into a contract to do so.

"Therefore, the Court rules that, as a matter of law, with EDRBA's requirements not having been complied with in this instance, the letter of intent approved in July of 2004 is a nullity. Accordingly, summary judgment is granted to the City of Wichita against plaintiffs' claims."

Genesis then appealed on a number of bases. The City cross-appealed, alleging that only for purposes of summary judgment had it failed to dispute Uncontroverted Fact No. 23. The City argued that if the case were remanded, it reserved the right to dispute the fact at that time.

## ANALYSIS

Issue 1: *The July 13, 2004, letter of intent was not a binding contract.*

*The parties' legal arguments*

The parties make numerous arguments to support their conflicting positions. Genesis generally argues that it entered into an agreement with the City "in the form of a binding letter of intent" dated July 13, 2004. It contends the City then breached this contract by not issuing the IRBs and granting ad valorem property tax abatements even though Genesis had "spent more than $1 million in reliance on the promise and in fulfilling the conditions of the agreement." Under Genesis' interpretation of the district court opinion, the court assumed the existence of a contract for which Genesis had met all conditions but nevertheless refused to enforce the contract because the City was without the power and authority to enter into it.

Genesis also argues that some of the requirements of the Act were eventually met so their absence cannot excuse the City's failure to perform. It points out, for example, that the district court found that the need for county approval of the action under K.S.A. 12-1741a was eliminated when the county's property at 29th and Maize Road was annexed by the City in May 2005. Uncontroverted Facts Nos. 10, 19, 20. Without a similar express finding by the district court, it nevertheless argues that the failure to notify the Maize School District was later corrected when the City's agent performed a corrected cost-benefit analysis. See, *e.g.*, Uncontroverted Fact Nos. 4, 9, 16, 17. It also suggests that the requirement

of notice to the school district is not of great importance: "Tellingly, the Act does not give a school district any ability to disapprove a letter of intent or bond issuance."

Genesis further argues that the purported statutory require-ments are not restrictions on a city's ability to enter into contracts, and that the Act does not require the passage of an ordinance for a city to enter into a contract to issue IRBs or grant tax abatements. It contends that City passage of an ordinance is simply the "final administrative step." Genesis therefore asks this court to reverse the district court's ruling and remand for a trial on damages "for the City's admitted breach of the valid and enforceable contract."

The City responds that the July 13, 2004, letter of intent was never a contract between the parties. It argues that the district court simply "pretended" the parties entered into a contract for the City to issue IRBs and grant tax abatements for the purpose of making a decision on the City's motion for summary judgment, and that the true issue on appeal is whether the contract is *enforceable.*

The City further responds that it is not bound unless and until the council passes an ordinance authorizing issuance of the IRBs and granting of the tax abatements. It also argues that the failure to comply with other statutory requirements, *e.g.*, failure to notify the Maize School District — which "deficiencies were never cor-rected" — nullifies the purported contract.

We need not analyze every one of these, and other detailed ar-guments, made by the parties. As explained below, the City's failure to fulfill a statutory requirement of timely notifying the Maize school district of potential tax abatements of property within the district's boundaries voids all subsequent City actions.

*Discussion*

The appellate standards for reviewing a district court's grant of summary judgment are well-known and are detailed in *Warner v. Stover*, 283 Kan. 453, 153 P.3d 1245 (2007). Highly summarized, the standards provide that genuine issues of material fact generally preclude summary judgment. Genesis initially claims that the dis-trict court erroneously granted summary judgment "despite the presence of disputed factual issues," but it has not controverted

any of the facts determined by the district court. Moreover, while Genesis has included many additional "facts" in its brief, it has not established that these facts are material.

Here, because the material facts are undisputed, this court's review is unlimited. See *Botkin v. Security State Bank,* 281 Kan. 243, 130 P.3d 92 (2006) (when facts are undisputed, appellate review of the district court's grant of summary judgment is de novo). Additionally, as this court will be reviewing several statutes, the interpretation of a statute is a question of law over which we exercise unlimited review. See *Schmidtlien Electric, Inc. v. Greathouse,* 278 Kan. 810, 819, 104 P.3d 378 (2005).

We begin our analysis with a brief overview of the relevant statutes out of which this controversy arises. Genesis requested that the City issue the IRBs and grant the tax abatements under the Economic Development Revenue Bonds Act, K.S.A. 12-1740 through 12-1749d ("EDRBA" or "the Act"). The parties are correct that the City's power to issue IRBs and grant accompanying tax abatements is contingent upon compliance with the Act, as we have recognized that:

"The industrial revenue bond act, K.S.A. 12-1740, et seq., and amendments thereto, is *complete and comprehensive* and sets forth the legislative policy of the state, together with *the procedure to be followed* by cities in the issuance of industrial revenue bonds." (Emphasis added.) *Rauh v. City of Hutchinson,* 223 Kan. 514, Syl. ¶ 4, 575 P.2d 517 (1978).

Our analysis focuses on one of the Act's statutes, K.S.A. 12-1749c, which specifically establishes part of "the procedure to be followed by cities in the issuance of" IRBs and granting of ad valorem tax abatements:

"*Prior to the approval of* an inducement resolution or *letter of intent* which includes an agreement for ad valorem tax abatement for property to be financed by issuance of any industrial revenue bonds under K.S.A. 12-1740 through 12-1749a, and amendments thereto, the county or city clerk, as the case requires, *shall notify in writing* the governing board of the unified school district within which the property proposed for exemption is located." (Emphasis added.) K.S.A. 12-1749c.

The district court acknowledged K.S.A. 12-1749c. It found, without controversion by Genesis, that "[t]he City did not send the

governing body of the Unified School District No. 266, Maize, Kansas written notice of either the Initial Genesis Proposal [dated June 18] or the Revised Genesis Proposal [dated July 12] until after the July 13 meeting" where "five members of the City Council of the City voted to: 'approve the one-year Letter of Intent to Genesis Health Clubs for Industrial Revenue Bonds.' " See Uncontroverted Fact Nos. 8-9.

The district court further found, without controversion by Genesis, that "[o]n July 13, 2004, the health club facility that was to be located under both projects [proposals dated June 18 and July 12] 'at the northwest corner of 29th and Maize Road' was within the territorial boundaries of Unified School District No. 266." Uncontroverted Fact No. 9. Without controversion by Genesis, the court reiterated that "[t]he notices sent out prior to the City entering into the Letter of Intent [on July 13] were incomplete as notice was not provided to Maize School District, within which one of the three tracts of land involved was located." Uncontroverted Fact No. 16.

The language of K.S.A. 12-1749c is clear: *"Prior* to the approval of [a] letter of intent . . . the city clerk . . . *shall* notify in writing." (Emphasis added.) Moreover, it is the only statute within the Act that requires any City action be taken prior to this particular event; all other required acts can be later. Contrast K.S.A. 12-1744a (at least 7 days prior to the issuance of any IRBs); K.S.A. 12-1744e (at least 7 days prior to adopting an ordinance authorizing the issuance of the IRBs); K.S.A. 12-1749d ("[p]rior to issuing any revenue bonds").

This particular notice requirement is likely imposed because school districts' financial well-being will be harmed by tax abatements of property within their boundaries. For years ad valorem property taxes have been a financing source for the districts. See K.S.A. 72-6431. In analogous areas of the law, local governmental failures to follow statutory procedures void their intended actions.

Just as the *Rauh* court held that the Act was complete and comprehensive for cities desiring to issue IRBs and grant ad valorem tax abatements, "the planning and zoning power of a municipality is derived solely from the grant contained in K.S.A. 12-741 *et seq.*"

*Crumbaker v. Hunt Midwest Mining, Inc.,* 275 Kan. 872, 884, 69 P.3d 601 (2003). Just as the *Rauh* court held that the Act sets forth "the procedure to be followed by the cities in the issuance of industrial revenue bonds," in zoning "we have long held that the power of a city government to change the zoning of property . . . can only be exercised in conformity with the statute which authorizes the zoning." *Crumbaker,* 275 Kan. at 886. As a result, a city's failure to follow the zoning procedures in state law renders its action invalid. 275 Kan. at 887.

The law of annexation is similar to the Act and zoning laws. As we held in *Crumbaker,* "[t]he power of a municipality to alter its boundaries by annexation is vested absolutely and exclusively in the legislature, and this power is therefore completely controlled by statute, *i.e.,* K.S.A. 12-519 *et seq.*" 275 Kan. at 884. Accordingly, like zoning and the Act, "[f]or a city to alter its boundaries by annexation, it must follow Kansas statutes." *Dillon Real Estate Co., Inc. v. City of Topeka,* 284 Kan. 662, 665, 163 P.3d 298 (2007) (citing *Crumbaker,* 275 Kan. at 884). If not, the " 'failure of a city to comply with requirements of the legislative enactment which gave it power and authority to annex territory nullifies the attempted annexation ordinance.' " *Dillon Real Estate,* 284 Kan. at 666.

In the specific instances of governmental failure to provide proper statutory notice, in both the fields of zoning and annexation this court has held the intended subsequent governmental actions are void. In *Crumbaker,* we held that the "City only sent notices to those owning property within 200 feet of the annexed land, not 1,000 feet. Proper notice is mandatory and must be complied with to give the planning commission authority to recommend action, and the city commission jurisdiction to act." 275 Kan. at 886. Similarly, in *Carson v. McDowell,* 203 Kan. 40, 44, 452 P.2d 828 (1969), despite a statutory requirement of publication notice of at least 20 days, only 19 days' notice was provided. This court held: "The provision for notice not having been complied with the city commission was without jurisdiction to pass the zoning ordinance and it is therefore void." Citing Annot., 96 A.L.R.2d 469, the court stated: "[U]nder the rule that proper notice is mandatory and ju-

risdictional, a zoning ordinance enacted on defective notice is generally held invalid."

Similarly, in *Ford v. City of Hutchinson,* 140 Kan. 307, 311, 37 P.2d 39 (1934), we held: "Without the statutory notice for thirty days of a hearing before the planning board, it has no power to give its official recommendation of a proposed change in zoning, and the city government is without power to pass an ordinance making such change." Because the "methodical steps prerequisite and precedent to changes in zoning districts . . . prescribed by law . . . were disregarded, the rezoning ordinance was a nullity." 140 Kan. at 312. In the same vein is *State ex rel. Hawks v. City of Topeka,* 173 Kan. 387, 246 P.2d 250 (1952). There, the city's notice to county officials of its anticipated annexation of county property failed to meet the statutory requirement. Among other things, the proposed annexation ordinance was not yet in existence. This court held that the "[f]ailure of the city to comply with requirements of the legislative enactment which gave it the power and authority to annex territory nullifies the attempted annexation ordinance. It therefore follows that city ordinance No. 8243 is inoperative, void and of no effect." 173 Kan. at 391.

In the related area of general obligation bonds and their accompanying special elections, we have announced our "long standing rule that municipalities cannot issue bonds unless the power to do so is conferred by legislative authority." *Byer v. Rural High School Dist. No. 4,* 169 Kan. 351, 358, 219 P.2d 382 (1950). As in zoning and annexation, we have also specifically held that a governmental failure to provide proper statutory notice voids its intended issuance of bonds. As this court stated in *Chanute v. Davis,* 85 Kan. 188, Syl., 116 Pac. 367 (1911), "[a]s a general rule, unless the statutory notice be given, a special city election authorizing a bond issue is invalid." There, instead of notice being published in a newspaper for 3 consecutive weeks, notice was published for 10 consecutive days. Because of this defect, the election was held invalid. See also *Heller v. Rounkles,* 171 Kan. 323, Syl. ¶ 2, 232 P.2d 225 (1951) (election on question of issuance of school bonds was invalid because the election notices and the ballots failed to state the proposition submitted so as to clearly inform the voters); *Byer,* 169 Kan.

at 359 (issuance of bonds enjoined after election because the notices and ballots failed to state the proposition submitted so as to clearly inform the voters).

The same fatal conclusion has been reached in other, although less closely related, areas as well. In *State ex rel. Griffith v. Drainage District*, 116 Kan. 291, 226 Pac. 478 (1924), this court held that the county commission's purported creation of a drainage district was void because the notice of hearing failed to sufficiently describe the property to be included in the district. We held: "It necessarily follows that all subsequent proceedings, including the attempted election of directors, and the attempted voting of bonds, are void and without effect." 116 Kan. at 296.

A synthesis of these authorities addressing related fields of law leads us to conclude that when the legislature finds important interests are at stake, they are statutorily protected by *mandatory* procedures, *i.e.*, proper notice and a meaningful opportunity to be heard are critical. Here, the important interest is taxes on property within a school district upon which it relies for financing some of its needs. Any reduction of the tax base, here 50% for at least 5 years with an option for 5 more, means that the district will likely reduce, if not eliminate, certain services and programs or else seek substitute funding through other sources, *e.g.*, user fees. According to Genesis' 2005 petition, approximately $1.7 million was its loss of the benefits of tax abatements on the three tracts for which it sought recovery.

Tax interests, whether a decrease in revenues to a governmental entity or an increase in burden on taxpayers, specifically have been recognized as important considerations for requiring compliance with statutory notices. This court acknowledged their protected status in *State ex rel. Fatzer v. Kansas City*, 169 Kan. 702, 222 P.2d 714 (1950). There, it was held that the city's statutory written notice to the county clerk and superintendent at least 10 days prior to approval of an annexation ordinance

"was intended to give the county clerk and the county superintendent an opportunity to present to the governing body of the city any information they thought proper and any objections they desired to make *because of the effect the ordinance would have upon local taxing districts.* These are matters which go to the prudence

and advisability of the approval of the ordinance of the governing body of the city." (Emphasis added.) 169 Kan. at 720.

A similar acknowledgment was made by this court in *State ex rel. Griffith*, 116 Kan. at 295. With the creation of a drainage district,

"its boundaries is an important matter. *Whether property owners are to be taxed for its support is important to them as well as to others in the district*; the county commissioners must have jurisdiction before a valid order creating the district can be made, *and this can be had only upon notice to the property owners*." (Emphasis added.)

And in *Chanute*, 85 Kan. at 190, this court questioned whether it should recognize a "publicity notice" which "has no legislative basis whatever upon which to rest in order to support a special election resulting in bonding the city, and thereby *adding to the burdens of every taxpayer within it limits*." (Emphasis added.)

A synthesis of all these authorities not only leads us to conclude that important interests are protected by mandatory statutory procedures, but also that governmental failure to comply with these procedures to protect important interests makes governmental action void. Indeed, according to the City, without refutation by Genesis, lack of written notice to the Maize school district was a deficiency that was never corrected.

We fully acknowledge that the property described as "the corner of 29th and Maize Road" contained within the U.S.D. No. 266 boundaries was identified in the July 6 newspaper publication. Thus the school district, like the general public, would have received general notice. However, the Act twice gives the school district extra notice protection. First, the specific written notice of *anticipated tax abatement* is required to be given to the district under K.S.A. 12-1749c before approval of the letter of intent. Second, written notice of the *hearing* of the anticipated tax abatement is also required to be given under K.S.A. 12-1749d before issuance of the bonds. That statute states in relevant part:

"Prior to issuing any revenue bonds . . . for any business the property of which will be eligible for an exemption from ad valorem taxation . . . , the governing body of any city, as the case requires, shall be required to:

. . . .

"(b) conduct a public hearing on the granting of such exemption. Notice of the public hearing shall be published at least once seven days prior to the hearing in the official city or county newspaper, as the case requires, and shall indicate the purpose, time and place thereof. *In addition to such publication notice,* the city . . . clerk . . . shall notify in writing the governing body of any . . . unified school district within which the property proposed for exemption is located." (Emphasis added.)

In short, these requirements specifically are in addition to any notice given the general public through mere publication in the newspaper. Clearly, the legislature has decided that school districts are required to be well, and repeatedly, informed of a potential loss of revenue due to abatement of taxes on property within their boundaries. We are not in a position to doubt the legislature's wisdom on this issue, for as was reiterated when this court upheld the constitutionality of the Act in 1961:

" 'An examination of the statute under which the challenged proceedings are being undertaken will reveal *a number of restrictions which the legislature must have deemed sufficient to prevent the defendant city from abusing the corporate powers vested in it,* and the legislative wisdom on this subject is not open to judicial review.' " *State ex rel. Ferguson v. City of Pittsburg,* 188 Kan. 612, 623, 364 P.2d 71 (1961) (citing *State ex rel. Beck v. Kansas City,* 149 Kan. 252, 255, 86 P.2d 476 [1939]).

We further note the presumption that the legislature does not intend to enact useless or meaningless legislation. *Hawley v. Kansas Dep't of Agriculture,* 281 Kan. 603, 631, 132 P. 3d 870 (2006). The particular notice required under 12-1749c to be given to the affected school districts is the only action specifically required under the Act to be given *before* approval of the letter of intent. Accordingly, we conclude that this statute must have some utility and meaning.

The Act specifies conditions that must be met for IRBs to be issued and tax abatements to be granted. Because the separate written notice required by K.S.A. 12-1749c was not sent to the Maize school district before the July 14 approval of the letter of intent, and even assuming without deciding that a letter of intent could otherwise be a contract, we must reject Genesis' argument that this document constituted a contract with the City which the City then breached. The City's approval, and its subsequent ac-

tions, are void. *Cf. Crumbaker*, 275 Kan. 872 (City's failure to follow the zoning procedures in state law renders its action invalid. Among other things, some landowners did not receive proper notice of the proposed action as required by K.S.A. 12-757[b]. The City only sent notices to those owning property within 200 feet of the annexed land, not 1,000 feet.).

Among Genesis' numerous remaining arguments are two closely related ones that warrant our attention. For the first argument, Genesis asserts that the legislature anticipated the very situation where an IRB-issuing municipality fails to send "the various notices" and provided the exclusive remedy: removal from office of any council member who approved the bond issuance. The statute upon which Genesis relies, K.S.A. 12-1744d, states:

"Failure to comply with the notice filing requirements of this act shall subject all members of the governing body of the issuing city or county who participated in the issuance of the revenue bonds to ouster from office upon complaint filed by the board of tax appeals in the office of the attorney general."

According to Genesis, through the statutory language the legislature made clear its intention that *any* "notice errors" by municipalities, including notice to the school districts under 12-1749c, do not affect the validity of the bonds. It asserts that "[i]f the Kansas legislature had intended for a defective notice to void the issuance of bonds, it would have chosen to provide for that instead of sanctions for the governing body."

For Genesis' second, and related argument, it relies upon K.S.A. 12-1741, 12-1744a, and 12-1744b to seemingly contend that they contain the only possible restrictions on a city's IRB issuance and tax abatement granting. K.S.A. 12-1741 states in relevant part: "Subject to the provisions of K.S.A. 12-1744a and 12-1744b, and amendments thereto, any city shall have power to issue revenue bonds . . . ."

Genesis reasons that the statute which authorizes the City to issue IRBs, K.S.A. 12-1741, is by its very language subject only to K.S.A. 12-1744a and 12-1744b. It argues that the latter two statutes "deal solely with certain reports that must be filed" with the Board of Tax Appeals at least 7 days prior to bond issuance. According to

Genesis, it follows that "[n]o provision of [the Act] makes the City's power and authority under K.S.A. 12-1741 subject to *additional* limitations." (Emphasis added.)

The first referenced statute, K.S.A. 12-1744a, states in relevant part that "(a) [a]t least seven days prior to the issuance of any revenue bonds, the city or county *shall file* a statement with the board of tax appeals of such proposed issuance containing the following information . . . ." (Emphasis added.)

The second referenced statute, K.S.A. 12-1744b, states in relevant part:

"Revenue bonds for which *notice is required to be filed pursuant to K.S.A. 12-1744a and amendments thereto* shall not be issued unless the chairperson of the board of tax appeals finds all information and documents required to be contained in such *notice* are complete and *timely filed*. The board of tax appeals shall establish, by rules and regulations, procedures for the *filing* of the required information and documents in the event that the information and documents originally *filed* are not found to be complete and timely *filed*, and such bonds may be issued upon compliance therewith." (Emphasis added.)

The City basically addresses Genesis' two related arguments as one. It responds that the ouster penalty in K.S.A. 12-1744d only relates to failure to comply with *"notice filing* requirements" with the Board of Tax Appeals. (Emphasis added.) See K.S.A. 12-1744a and -1744b. The City argues that by contrast, K.S.A. 12-1744d's penalty does not apply to the requirement of simple "notice" to school boards found in K.S.A. 12-1749c and 12-1749d. Based upon the plain language of these statutes, we agree with the City and reject Genesis' expansive definition of "all notices." The Act clearly distinguishes between "notice" and "notice *filing* with board of tax appeals" requirements. (Emphasis added.) Our conclusion is further strengthened when we observe that 12-1744d not only specifies "notice filing requirements," but also expressly provides that failure to meet those requirements may result in ouster only "upon complaint *filed by the board of tax appeals."* (Emphasis added.) In short, a failure to file with the Board of Tax Appeals allows that board to complain to the attorney general.

This statutory language also indicates that ouster is not meant to be the sole remedy. We agree with the City that the provision

protects the IRB applicant who seeks tax abatements against a municipality's failure to make proper application with the Board of Tax Appeals for approval; the applicant may always refile its request, albeit belatedly, with the new city council. By contrast, the tax revenue interests of an affected school district are not protected in any fashion or degree by a post-decision ouster of government officials; the revenue is simply lost for as long as the original abatement is in existence. We independently observe that Genesis' "ouster as exclusive remedy" argument is inconsistent with the triple notice protection the Act affords school districts in danger of losing part of their revenue through tax abatements.

This same rationale applies to reject Genesis' related argument that based upon the language of K.S.A. 12-1741, the only Act restrictions on "contracting" to issue IRBs are in the provisions of K.S.A. 12-1744a (notice to the Board of Tax Appeals) and K.S.A. 12-1744b (approval of paperwork by the Board of Tax Appeals). Not only is Genesis' argument inconsistent with the triple notice protection afforded school districts, but we also agree with the City that Genesis' position is inconsistent with numerous other Act provisions, *e.g.*, 12-1741a and 12-1741b (circumstances under which a city's and county's issuance of IRBs must be approved by another city or county). Like the district court, we conclude that these provisions must have some utility and meaning.

We independently observe inconsistencies within Genesis' own arguments. For its "ouster is exclusive remedy" argument, it adopts an expansive interpretation of "notice filing requirements" in 12-1744d as including "all notices," *e.g.*, to the school district under 12-1749c. According to Genesis, because notice was not provided to the district here, the district's sole remedy is to attempt ouster of the city council members. By contrast, Genesis adopts a restrictive interpretation of those same requirements under 12-1744a and 12-1744b as it asserts that those two statutes "deal solely with certain reports that must be filed with the board of tax appeals." According to Genesis, because the City's power to issue IRBs and to grant tax abatements is only limited by failing to comply with these particular filing requirements with the Board of Tax Appeals, fail-

ure to comply with the requirement of notifying the school district is not a limitation.

We specifically hold that the notice to the school district before approval of the letter of intent is paramount.

Issue 2: *Promissory estoppel does not prevent the City from refusing to issue the IRBs and grant ad valorem tax abatements.*

Genesis next argues that it detrimentally relied on the purported contract with the City and spent more than $1 million believing that the IRBs would be issued and tax abatements granted. Accordingly, it claims recovery under promissory estoppel. The City disagrees, relying upon, *inter alia, Blevins v. Board of Douglas County Comm'rs*, 251 Kan. 374, 834 P.2d 1344 (1992).

Like the instant case, *Blevins* dealt both with promissory estoppel and a governmental entity's inability to contract without following statutory procedures. There, plaintiffs argued that the county's 1986 issuance of bonds on a county trafficway project was illegal because the county was not authorized to do so under its home rule powers. 251 Kan. at 376. This court agreed, ruling that a public vote should have been taken approving the bond issue under K.S.A. 68-580 *et seq*. We entered judgment for plaintiffs who had sought an injunction preventing the county from spending the money raised by the bonds without the approval of the voters.

This court's opinion was filed December 8, 1989. Later that month, the county commissioners decided to hold an advisory election on the trafficway financing. According to an affidavit by its chairperson, " '[t]he Board of County Commissioners has agreed publicly, however, to be bound by the results of the election.' " 251 Kan. at 377. Several individual county commissioners also stated publicly that although the election was technically advisory, the county would be bound by its results. That same month the county's attorney sent a letter to plaintiffs' counsel reiterating the county's position that "the County has irrevocably committed itself to holding an election as a precondition to spending bond proceeds on the trafficway project" and "Douglas County is fully committed to the election process." 251 Kan. at 377.

On January 31, this court granted the county's motion for rehearing and withdrew its opinion. In July 1990, the court issued a second opinion, reaffirming that the county had illegally issued the bonds because it failed to follow K.S.A. 68-580 *et seq.* which requires a public vote. However, because of past confusion from this court's prior decisions, it validated the bonds, holding that its decision would apply only to future bond authorizations and issuances. Plaintiffs had previously informed this court that they had no objection to a prospective application of the court's decision " 'conditioned upon the Trafficway being submitted for voter approval in a binding election, as promised by both governing bodies.' " 251 Kan. at 378.

In November 1990 an advisory election was held, and the county voters approved the spending of the bond proceeds. Plaintiffs again filed suit, claiming the ballot question was biased and misleading. Among other things, plaintiffs argued to the Supreme Court that county statements as to the binding effect of the proposed election in requesting reconsideration of the initial opinion estopped or precluded the county from denying the election was binding. After the district court dismissed plaintiffs' petition and the Court of Appeals reversed and remanded, this court was then faced with a question similar to the one in the instant case — "whether the County was required to conduct a binding election regarding the spending or retirement of these bonds, as a matter of law." 251 Kan. at 382.

Similar to the instant case, this court noted that counties may only hold binding elections in accordance with the statutory authority set out by the legislature. 251 Kan. at 382. Because this court had previously validated the· county's earlier bonds, despite the county's failure to follow statutory procedures for their issuance, it held that the county was not now "required to hold an election pursuant to K.S.A. 68-584 and furthermore had no statutory authority to hold a *binding* election." 251 Kan. at 382.

The court then turned to plaintiffs' argument that the county was estopped from claiming it did not have the statutory authority to hold a binding election and that the county's statements about holding such an election created an implied contract to follow

through with that promise. In rejecting these positions, the court held:

"If a municipal corporation enters into a contract it has no power to make, it is ultra vires and unenforceable and no further inquiry into the contract's validity is necessary. 10 McQuillin, Municipal Corporations § 29.02 (3d ed. rev. 1990).

"Contracts which a municipal corporation is not permitted legally to enter into are not subject to ratification, and a city may not be estopped to deny the invalidity of a contract that is ultra vires in the sense that it is not within the power of the municipality to make. *In other words, no ratification or estoppel can make lawful a municipal contract* which is beyond the scope of the corporate powers, or *which is not executed in compliance with mandatory conditions prescribed in the charter or statutes*, or which is contrary to a declared policy adopted to protect the public. The notice imputed to all persons dealing with a municipal corporation of the limits of its powers, is in some cases advanced as the reason upon which these rules are based.

. . . .

"The fact that the other party to the contract has fully performed its part of the agreement, or has expended money in reliance of its validity, does not estop the city from asserting ultra vires, nor is a municipality estopped to aver its incapacity to make a contract because it received benefits under it. That is, *it cannot be made liable either on the theory of estoppel or implied contract, where it had no capacity to make the contract or where it was made in express violation of law.* 10A McQuillin, Municipal Corporations § 29.104.30 (3d ed. rev. 1990)." (Emphasis added.) *Blevins*, 251 Kan. at 384.

Based upon *Blevins'* holding and rationale, because the City had no authority to approve a letter of intent without prior notice to the Maize school district as required by statute, neither can promissory estoppel afford Genesis relief.

Lastly, Genesis argues that

"[i]f this court were to adopt the lower court's ruling that the City could not enter into a binding contract to issue IRBs despite the fact that the City has the power and authority to perform that contract, it would preclude all municipalities and counties in Kansas who may wish to enter into such binding agreements from doing so. Such a decision violated Kansas public policy and contradicts the statement of purpose the Kansas legislature wrote into the EDRBA."

Our holding that failure to meet the statutory notice requirement makes any alleged contract void effectively disposes of Genesis' final argument. Simply put, we acknowledge that K.S.A. 12-1740 does state the purpose of the Act, *e.g.*, "to promote, simulate and develop the general welfare and economic prosperity of the

state of Kansas . . . by authorizing all cities and counties of the state to issue revenue bonds." However, the track to fulfilling that purpose contains procedural, protective hurdles placed by the legislature that must be cleared. See *Rauh*, 223 Kan. at 521 (noting the Act contains "strong and binding safeguards to protect the public"); see also *State ex rel. Ferguson*, 188 Kan. at 619 (in declaring original Act constitutional, court acknowledged " 'a number of restrictions which the legislature must have deemed sufficient to prevent the defendant city from abusing the corporate powers vested in it' ").

Finally, as mentioned, the City cross-appeals the district court's Uncontroverted Fact No. 23 contained in its summary judgment order. We need not reach this issue given our conclusion that summary judgment was properly entered.

Affirmed.