No. 53,834

Donald L. McGinnis, *Plaintiff-Appellee,* v. Kansas City Power and Light Company, *Defendant-Appellant.*

(647 P.2d 1313)

Opinion filed July 16, 1982.

*Carl W. Hartley,* of Rinehart, Bright & Hartley, of Paola, argued the cause, and *Paul Anthony White,* of Kansas City, Missouri, was with him on the briefs for the appellant.

*Anne L. Baker,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Prager, J.: This is an action for an injunction brought by the plaintiff, Donald L. McGinnis, seeking to enjoin the defendant, Kansas City Power and Light Company (KCPL), from entering upon certain land owned by the plaintiff for the purpose of constructing an electrical transmission line. In an earlier condemnation action, KCPL sought to condemn an easement across the plaintiff's property for the purpose of constructing a portion

of a 345 kilovolt electric transmission line from the Wolf Creek Nuclear Power Plant in Coffey County to an electric substation in Johnson County. While the Wolf Creek Nuclear Power Plant had been in the process of development and construction for several years, it was not until the condemnation action was filed by KCPL in February, 1981, in the district court of Anderson County that KCPL specifically turned its attention to the acquisition of easements for construction of the electric transmission line.

The plaintiff's request for injunctive relief was based upon the proposition that KCPL had failed to comply with the provisions of the Kansas Siting Act (K.S.A. 66-1,177 *et seq.*) which was enacted in 1979 and which provides in part as follows:

"66-1,178. **Siting of electric transmission lines; permit required; application, contents; hearing.** *No electric utility may begin site preparation for or construction of an electric transmission line, or exercise the right of eminent domain* to acquire any interest in land in connection with the site preparation for a construction of any such line *without first acquiring a siting permit from the commission.* Whenever any such electric utility desires to obtain such a permit, it shall file an application with the commission setting forth therein that it proposes to construct an electric transmission line and specifying the proposed location thereof, the names and addresses of the landowners of record whose land or interest therein is proposed to be acquired in connection with the construction of such a line and such other information as may be required by the commission. Thereupon the commission shall fix a time for a public hearing on such application, which shall be not more than sixty (60) days from the date the application was filed, to determine the reasonableness of the location of the proposed electric transmission line. The commission shall fix the place for hearing, which may be in any county through which the electric transmission line is proposed to traverse." (Emphasis supplied.)

"66-1,179. **Same; notice of hearing.** The commission shall publish notice of the time, place and subject matter of such hearing in newspapers having general circulation in every county through which the electric transmission line is proposed to traverse once each week for three (3) consecutive weeks, the last publication to be not less than five (5) days before such hearing date. Written notice by certified mail of such hearing and a copy of the application shall be served not less than twenty (20) days prior to the hearing date upon all landowners, as shown by the application."

"66-1,182. **Same; not applicable, when.** The provisions of this act shall not apply to any electric utility *which complies with the provisions of the national environmental policy act of 1969 with regard to the siting of electric transmission lines.*" (Emphasis supplied.)

It was the position of the plaintiff that KCPL had not applied for or obtained a siting permit from the Kansas Corporation Commission (KCC) as required by the Kansas Siting Act and thus

KCPL had no right to condemn an easement across plaintiff's property or go upon the plaintiff's property to construct the line.

The facts in the case are mostly undisputed and essentially are as follows: In 1975, KCPL filed an environmental impact statement (EIS) pertaining to the overall construction of the Wolf Creek Nuclear Power Plant which included alternative proposals for transmission lines. The documents, contained in the record before the trial court, show that a preferred route and three alternative routes for an electric transmission line were originally proposed by KCPL to the Nuclear Regulatory Commission (NRC). The EIS was approved by the NRC subject to further proceedings as provided in its regulations. At the time approval of the EIS was obtained in 1975, the federal regulations did not provide for any direct notice to affected landowners or any specific public hearing on the location of proposed transmission lines.

In 1978, the Council on Environmental Quality, which was established under the National Environmental Policy Act of 1969 (NEPA), produced additional regulations for all federal agencies to follow in implementing NEPA. These regulations, in substance, required a federal agency to cooperate with state and local officials and to incorporate state and local requirements into environmental statements and further required *the giving of notice to agencies and persons who might be affected by its actions.*

At about the same time, numerous controversies arose across the country between electric utilities constructing electric power lines and interested property owners who were notified out of a clear blue sky that a portion of their land was to be condemned for easements for transmission lines. The property owners were most upset that they had no reasonable opportunity to have a hearing where they could object to the particular placement of the transmission lines and to point out the specific environmental impact that the lines would have upon their properties.

In 1979, the problem was brought to the attention of the Kansas legislature. Representatives of the Kansas Farmers Union, the National Audubon Society, and various individual farmers and ranch owners appeared and testified before a committee of the Kansas House. The committee also heard spokesmen for the Electric Companies Association of Kansas and the Kansas Electric Cooperatives. The farmers and the environmentalists com-

plained of lack of advance notice of the proposed location for construction of electric transmission lines. They emphasized the need for input from the public and interested citizens as to the environmental impact on the areas which might be affected by such construction. The testimony was generally in support of House Bill No. 2130, which later became the Kansas Siting Act, K.S.A. 66-1,177 *et seq.* Harold Shoaf, director of public relations and public affairs for the Kansas Electric Cooperatives, in his testimony advised the members of the house committee that Kansas electric cooperatives were already required to comply with certain public notice procedures required by NEPA and federal regulations and that the obtaining of an additional siting permit from the KCC, after a permit had already been obtained from the federal agency, would cause duplication of effort and unnecessary additional costs. The thrust of Mr. Shoaf's statement was that all property owners whose lands would be affected by electric transmission lines subject to control by federal agencies would have an opportunity under the federal regulations to receive prior notice and to appear at a hearing where their positions could be stated. The legislature obviously considered the statements made by these various interested citizens and enacted the Kansas Siting Act, including therein the exemption contained in K.S.A. 66-1,182 which made the act inapplicable to any electric utility "which complies with the provisions of the national environmental policy act of 1969 with regard to the siting of electric transmission lines."

The controversy arose in this case in February of 1981 when KCPL commenced the condemnation action in the district court of Anderson County to condemn an easement across land owned by plaintiff McGinnis. In that condemnation action, the plaintiff from the beginning challenged the authority of KCPL to condemn easements for the proposed transmission line until KCPL had obtained a siting permit in compliance with the provisions of the Kansas Siting Act. The trial judge in the condemnation action held that the issue of KCPL's noncompliance with the Kansas Siting Act was a matter not properly before the court in the condemnation action and that the issue could only be raised in an independent action for injunctive relief. The district court then approved the taking and appointed three appraisers who filed their report on March 18, 1981. On April 17, 1981, the KCC filed notice of appeal from the appraisers' award.

On May 5, 1981, plaintiff McGinnis filed his petition for an injunction in the case now before this court. In his petition, the plaintiff requested the court to enter judgment holding that KCPL had failed to comply with the Kansas Siting Act and that it should be enjoined from entering or trespassing upon the plaintiff's property for site preparation until compliance with the act was shown.

The case was tried to the court. Plaintiff's evidence showed that landowners had not been notified of the proposed site of the transmission line until KCPL filed its condemnation action to obtain the necessary easements for the transmission line. KCPL took the position that, having obtained approval of its environmental impact statement relating to the construction of Wolf Creek Nuclear Power Plant by the Nuclear Regulatory Commission on October 31, 1975, it had complied with the provisions of NEPA with regard to the siting of electric transmission lines and, therefore, it qualified within the exemption provided by K.S.A. 66-1,182. KCPL also raised certain issues challenging the jurisdiction of the district court which will be discussed later in the opinion. The primary issue for determination by the court was whether KCPL was exempted from the requirements of obtaining a siting permit under the Kansas Siting Act on the basis that it had complied with NEPA. The case was submitted to the district court for decision and, at the conclusion of the hearing, the court dictated in the record certain findings of fact which were later incorporated in the journal entry of judgment. Specifically, the trial court found there had been compliance by KCPL with NEPA prior to the effective date of the Kansas Siting Act, but there was no compliance with NEPA by KCPL subsequent to July 1, 1979. In support of its findings the court cited various regulations of the Council on Environmental Quality which had been introduced into evidence.

The trial court noted that the federal regulations requiring notice to be given to interested parties were published on November 29, 1978, to become effective on July 30, 1979. The court stated that at the time the Kansas legislature enacted the Kansas Siting Act in April of 1979, the federal regulations required that reasonable notice be given to interested persons where proposed electric transmission lines were involved. The court construed

K.S.A. 66-1,179 as requiring compliance with the notice require-
ments of the new federal regulations which had been adopted
when the Kansas Siting Act was enacted. The district court then
entered judgment granting plaintiff's petition for an injunction
and enjoining KCPL from entering upon the plaintiff's land for
site preparation "until such time as the defendant has complied
with the provisions of K.S.A. 66-1,177 *et seq.,* by acquiring a
siting permit from the Kansas Corporation Commission or com-
plying with the provisions of the National Environmental Policy
Act of 1969 subsequent to July 1, 1979." From this judgment,
KCPL has appealed to this court.

Before turning to the primary issue in the case, we will consider
points raised by KCPL which attack the jurisdiction of the court
to consider the case on its merits. The first point raised by the
defendant is that the construction of the Kansas Siting Act was a
matter for the exclusive determination of the Kansas Corporation
Commission and an issue over which the KCC had previously
exercised its jurisdiction so as to preclude a judicial determina-
tion in this case.

The record discloses that Joseph Schneider, another property
owner in the area, filed a complaint with the KCC on May 26,
1981, 21 days after McGinnis filed this action, complaining that
KCPL had exercised its right of eminent domain to begin site
preparation for an electric transmission line without first obtain-
ing a siting permit and without complying with NEPA as re-
quired by the Kansas Siting Act. KCPL filed an answer alleging,
in substance, that the siting act was not applicable, since KCPL
had complied with NEPA. The matter was submitted to the KCC.
On June 15, 1981, the KCC held that KCPL was in compliance
with NEPA since it had filed an environmental impact statement
with the NRC which had been approved by the NRC in 1975. The
KCC thereupon dismissed the complaint of Schneider.

It is the position of KCPL in this case that this finding of
compliance by the KCC constituted a prior determination of the
issue of compliance and barred the district court in this case from
reconsidering the issue. We find no merit to this contention. The
courts of this state have jurisdiction to inquire in appropriate
actions whether a public utility has exceeded its lawful authority
in bringing a condemnation case against a landowner. See *Con-
cerned Citizens, United, Inc. v. Kansas Power & Light Co.,* 215

Kan. 218, 523 P.2d 755 (1974). The interpretation of a statute involves a question of law and the final construction thereof rests with the courts. *Amoco Production Co. v. Armold, Director of Taxation,* 213 Kan. 636, 518 P.2d 453 (1974). The basic issue of law presented in this case was the construction of K.S.A. 66-1,182 which exempts certain electric utilities from the application of the siting act, where the electric utility complies with the provisions of NEPA. Any determination of this issue by the KCC is not final and is properly subject to later determination in the Kansas courts.

KCPL argues, however, that the previous ruling of the KCC in the proceeding involving Joseph Schneider constituted a prior determination of this issue which is controlling upon the district court under the doctrines of res judicata and collateral estoppel. We find this point to be without merit. The defendant, Donald L. McGinnis, was not a party to the action filed by Joseph Schneider before the KCC and was not in privity with Schneider. Since McGinnis was not a party to the prior proceeding, the doctrines of res judicata and collateral estoppel cannot be applied to bar McGinnis in this case. It should be noted that KCPL could have avoided the problem of further litigation by requesting the KCC to include McGinnis as a party and to give notice to all landowners of the proceeding so that the matter might be determined as against all landowners along the Wolf Creek electric transmission line. KCPL failed to do this. We, thus, have concluded that the district court in this case had jurisdiction to determine whether KCPL was exempt from the site permit requirements of the Kansas Siting Act.

KCPL's second point is that McGinnis, as a landowner, was barred from making a collateral attack, by an independent action for an injunction, on the validity of the easement obtained by KCPL in an eminent domain action. Simply stated, it is the argument of KCPL that plaintiff McGinnis should have filed an action and sought a temporary restraining order to enjoin the condemnation action *before* the conclusion of the eminent domain proceeding. It argues that, since KCPL had paid the award into court, the condemnation had become an accomplished fact and, thus, an action to enjoin a completed condemnation action is moot. We, likewise, find no merit to this contention. Under the Kansas Siting Act, compliance with the act was a prerequisite to

both condemnation and entry upon the land. It is important to note that this action challenges the *legal authority* of the condemning authority, KCPL, to take plaintiff's property by eminent domain. Kansas courts have entertained injunction actions challenging the extent or validity of an eminent domain proceeding many years subsequent to the conclusion of the condemnation action. See for example *Spears v. Kansas City Power & Light Co.,* 203 Kan. 520, 455 P.2d 496 (1969). The law is clear that the only way a landowner may attack the right of a public utility to exercise the power of eminent domain is for a landowner to bring an independent action, usually by suit for injunction. *Kansas Gas & Electric Co. v. Winn,* 227 Kan. 101, 605 P.2d 125 (1980). Moreover, we think it important here that KCPL has appealed the award granted in the condemnation proceeding and that plaintiff has not withdrawn the award from the district court. Thus, the action is pending and there has been no final determination made in the eminent domain case. Furthermore, KCPL has not entered upon the property or constructed the transmission line and hence there can be no question of mootness involved. We have concluded that the independent action for an injunction brought in this case was the proper way for the plaintiff to challenge the eminent domain proceeding and the right of KCPL to enter upon his land to commence construction of the transmission line.

KCPL next contends that it was entitled to judgment as a matter of law at the close of the plaintiff's evidence. Essentially, KCPL takes the position that there had been a complete failure of plaintiff's proof, because plaintiff presented no evidence to show that KCPL had failed to comply with the requirements of NEPA. It is KCPL's position that the burden of proof was upon the plaintiff to show that defendant did not fall within the exception of the siting act. The law is otherwise. The general rule recognized in Kansas is that an exception or proviso in a statute, which follows and restricts an enacting clause general in its scope, should be strictly construed so as to exclude only those cases which are fairly within the terms of the proviso, and the burden of proof is on the one claiming benefit of the exception or proviso. *Emporia Township v. Williams,* 149 Kan. 860, 861-62, 89 P.2d 919 (1939); *City of Winfield v. Board of County Commissioners,* 205 Kan. 333, 469 P.2d 424 (1970); *Elliott v. State Dept. of Social & Rehab. Serv.,* 3 Kan. App. 2d 494, 496, 597 P.2d 679 (1979).

Since KCPL is relying upon the exception contained in K.S.A. 66-1,182, it had the burden of coming forward with evidence to prove that it was not required to obtain a siting permit since it had complied with the provisions of NEPA in regard to the siting of electric transmission lines. The question of compliance was thus a mixed question of law and fact to be determined by the district court in this case.

We turn now to the primary issue in the case: Whether the trial court erred in holding that K.S.A. 66-1,182 requires KCPL to comply with NEPA and federal regulations issued thereunder on and after July 1, 1979, the effective date of the Kansas Siting Act. Before determining this issue, we must first examine the provisions of the Kansas Siting Act to determine the legislative intent. K.S.A. 66-1,178 states, in substance, that no electric utility may begin site preparation for construction of an electric transmission line or exercise the right of eminent domain to acquire any interest in land in connection with preparation of any land to construct any transmission lines without first obtaining a siting permit. K.S.A. 66-1,182 states that the provisions of the act shall not apply to any electric utility which complies with the provisions of the National Environmental Policy Act of 1969 with regard to the siting of electric transmission lines. After considering the legislative history of the act, we believe that the purpose of the exemption was to avoid duplicate procedures so that an electric utility should not be required to obtain a siting permit in cases where it had already undertaken comparable procedures under NEPA and applicable federal regulations to the extent it had fully achieved the purposes of the Kansas Siting Act.

Simply stated, it is the position of KCPL that, upon the publication of the environmental statement on the construction phase on October 31, 1975, by the National Regulatory Commission, and the issuance of a Construction Permit on May 17, 1977, by the Atomic Safety and Licensing Board, from that point on it was in full compliance with NEPA and it was thereafter, as a matter of law, exempt from the requirement of obtaining a siting permit from the KCC. Plaintiff and the trial court took a different position. They maintained, in substance, that the October 1975 approval of KCPL's environmental impact statement was only a preliminary approval of construction of the plant and not the

final approval of the location of the proposed electric transmission lines as contemplated by NEPA and the Kansas Siting Act. The issue presented is not an easy one. It is complicated by the morass of federal statutes and regulations which are applicable to nuclear power projects. To find an answer to our question, it is necessary to explore the provisions of NEPA and the federal regulations adopted by those federal agencies which have been given the responsibility of carrying out the public policy of NEPA. This court has not had occasion before to consider this issue. It would thus be helpful to set out basically what NEPA is and consider its purposes and objectives.

42 U.S.C.A. § 4321 sets out the Congressional declaration of purpose behind NEPA as follows:

"To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." pp. 523-24.

42 U.S.C.A. § 4331(a) sets forth the Congressional declaration of national environmental policy. That section declares, among other things, that it is the continuing policy of the federal government, in cooperation with state and local governments, to use all practicable means and measures to create and maintain conditions under which man and nature can exist in productive harmony. Section (c) provides a Congressional recognition that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Section 102 (42 U.S.C.A. § 4332) is the heart of NEPA. It states, in substance, that to the fullest extent possible all agencies of the federal government shall make available to states, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment. Very relevant to the issue before us is 42 U.S.C.A. § 4334, which recognizes the obligations of a federal agency to coordinate or consult with other federal or state agencies and to act or refrain from acting contingent upon the recommendations or certification of any other federal or state agency.

42 U.S.C.A. § 4332 requires the filing of environmental impact statements on all major federal actions significantly affecting the environment. There has been much litigation based on this sec-

tion. An excellent review of this litigation may be found in Coggins & Hensley, *Environmental Law Creeps into Kansas: A Commentary on the Concerned Citizens United Suit,* 23 Kan. L. Rev. 421, 447 (1975), and Coggins & Wilkinson, *Federal Public Land and Resources Law,* p. 260 (1981). In this litigation, the procedural issues have often become paramount. The courts have held federal agencies to strict compliance with NEPA *procedural* mandates and they have had no hesitancy overturning an agency's decision if it has failed to comply with NEPA procedures. *Calvert Cliffs' Coord. Com. v. United States A.E. Com'n,* 449 F.2d 1109 (D.C. Cir. 1971); *National Helium Corporation v. Morton,* 455 F.2d 650, 655-56 (10th Cir. 1971); *Natural Resources, Etc. v. U.S. Nuclear Reg. Com'n.,* 685 F.2d 459 (D.C. Cir. 1982).

Another important theme which has developed from the cases interpreting NEPA is that NEPA is an environmental disclosure act that requires the agency to deal with environmental concerns and *obtain public input at every stage of the decision making process.* It is clear that NEPA requirements are ongoing and apply to projects at every stage of the proceeding, even if such projects were commenced before the effective date of NEPA or the guidelines later developed by the Council on Environmental Quality (CEQ). See *Environmental Defense Fund v. Tennessee Val. Auth.,* 468 F.2d 1164, 1176-81 (6th Cir. 1972); 40 C.F.R. §§ 1502.9, 1506.12 (1981).

In summary, a court reviewing whether an agency has complied with NEPA must review the procedural requirements, specifically and strictly, and should require the agency to show that it has adequately informed the public of the environmental consequences at every stage of the project. NEPA, as noted above, has directed the agencies of the federal government to carry out the Congressional policies. In the case now before us, KCPL in constructing the Wolf Creek Nuclear Power Plant, including electrical distribution lines, is governed by the regulations of the NRC. Although these regulations establish no specific criteria regarding the siting of electric transmission lines, the regulations at 10 C.F.R. § 51.23(c) (1982), require compliance with standards and requirements which have been imposed by federal, *state,* and local agencies having responsibility for environmental protection, including applicable zoning and land-use regulations. Sec-

tion 51.20(c) suggests that, if there are state regulations regarding such matters as the siting of electric transmission lines, then an applicant *must comply* with those requirements in order to be said to have complied with NRC requirements. These are consistent with the Atomic Energy Act from which NRC gets its power to regulate. At 42 U.S.C.A. §2018, it is stated that nothing in the act shall be construed to effect the authority or regulations of any federal, state or local agency with respect to the generation, sale, or *transmission of electric power* produced through the use of nuclear facilities licensed by the commission. These regulations are also consistent with the general guidelines developed by the Council on Environmental Quality which declare that federal agencies shall cooperate with state agencies to the fullest extent possible. 40 C.F.R. § 1506.2(c) states that where state laws have environmental impact statements, in addition to but not conflicting with those in NEPA, federal agencies shall cooperate in fulfilling these requirements so that one law will comply with all applicable laws.

It is also clear that compliance by agencies governed by NEPA with federal regulations is an ongoing process which arises again and again in the course of development and construction of nuclear power plants and their electric transmission lines. In the NEPA regulations which were adopted in 1973 by the Council on Environmental Quality, § 1500.13 states specifically that agencies have an obligation *to reassess ongoing projects* or programs in order to avoid adverse environmental effects. That section clearly demonstrates the continuing nature of compliance with the regulations when it states as follows: "It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program." These rules and regulations were in effect at the time KCPL filed its original environmental impact statement which was published in October of 1975 by the Nuclear Regulatory Commission. These 1973 regulations did not emphasize the requirements of *notice* to interested agencies and individuals to the extent they were incorporated in the regulations adopted in 1978. However, § 1500.09(d) of the 1973 regulations emphasized that the procedures established by these guidelines are developed to encourage public participation in the impact statement process at the earliest possible time. It further stated that agency procedure

should make provision for facilitating the comment of public and private organizations and *individuals.* Section 1500.10(b) stated that copies of final statements shall be sent to all federal, state, and local agencies and to individuals.

Probably as the result of extensive litigation, the NEPA regulations were dramatically changed in 1978 to obtain increased public input from interested public agencies and from individuals who would be directly interested in or affected by a particular project. Section 1501.7 of the 1978 regulations provides for a "scoping" process. Scoping involves the determination of the issues to be addressed and identification of the significant issues relating to a proposed action. Section 1503.1 provides that before preparing a final environmental impact statement, the agency shall request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected. Section 1506.6 requires agencies to make a diligent effort to involve the public in preparing and implementing NEPA procedures and, in the case of an action with effects primarily of local concern, suggests direct mailing to owners and occupants of nearby or affected property. Section 1506.12 provides the effective date of these regulations is July 30, 1979, but then declares that these regulations shall apply to the fullest extent practicable to ongoing activities begun before the effective date. Thus, the ongoing nature of the procedure requiring compliance with the 1978 regulations and their application to projects begun before the effective date of the regulations is clearly and unequivocally stated.

After this case was decided in the district court and the case was pending on appeal, KCPL filed a motion for the court to take judicial notice of a second assessment of the environmental impact statement associated with the Wolf Creek Nuclear Power Plant issued by the NRC in the spring of 1982. It is stated in the motion that this assessment is *an additional step in the continuing proceedings* required by NEPA and 10 C.F.R. Part 51 as amended. We have sustained the motion of KCPL and have added this additional document to the record in the case. KCPL, however, has made no showing that in obtaining this supplemental assessment it complied with the procedural and notice steps required under the 1978 regulations which become effective in 1979.

From all of the documents discussed above, we have concluded that, at this point, KCPL has not established in the record that it is in compliance with NEPA and the regulations issued by the NRC under the authority of that act. We hold that the trial court correctly determined the issues presented in this case and properly issued an injunction enjoining KCPL from entering upon the plaintiff's land for site preparation until such time as the defendant has shown a compliance with the provisions of K.S.A. 66-1,177 *et seq.* either by acquiring a siting permit from the Kansas Corporation Commission or by showing that it has given comparable notice and hearing under the provisions of NEPA subsequent to July 1, 1979. The district court has retained continuing jurisdiction in the case and, therefore, KCPL may at any time move for a hearing so that it may have the opportunity to show that it is now in compliance with NEPA and the federal regulations. At such hearing, KCPL has the burden of showing that it is in compliance. If it does so, it may then proceed to prepare the site on the easement for the construction of its electric transmission line. If it fails to show such compliance, then the injunction shall continue in effect. As an alternative, KCPL may proceed under the Kansas Siting Act and obtain a siting permit as required thereunder.

The judgment of the district court is affirmed.