No. 99,768

KARL P. WINKEL, SR., and KAREN S. WINKEL, Trustees of the Karl P. Winkel, Sr., TRUST NO. 1, Dated July 1, 2004, *et al.*, *Appellants*, v. DEBRA L. MILLER, SECRETARY OF TRANSPORTATION OF THE STATE OF KANSAS, *Appellee.*

(205 P.3d 688)

Opinion filed March 27, 2009.

*David P. Troup*, of Weary Davis, L.C., of Junction City, argued the cause and was on the brief for appellants.

*Gelene Savage*, of the Kansas Department of Transportation, argued the cause, and *Vicky S. Johnson*, of the same department, was with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Karl P. Winkel, Sr., and Karen S. Winkel, Trustees of the Karl P. Winkel, Sr., Trust No. 1, dated July 1, 2004, (Winkel) appeal the summary judgment granted to Debra L. Miller, Secretary of Transportation of the State of Kansas (KDOT), on a petition for injunctive relief and damages. This appeal is a continuation of Winkel's persistent efforts, commencing in 1994, to stop KDOT's operation of an asphalt mixing strip near Winkel's farmstead. Two prior actions were appealed to the Kansas Court of Appeals. See *Winkel v. Kansas Dept. of Transp.*, No. 73,289, unpublished opinion filed March 15, 1996 (*Winkel I*); and *Winkel v. Kansas Dept. of Transp.*, No. 94,088, unpublished opinion filed April 7, 2006 (*Winkel II*). In this latest litigation, we affirm the district court's summary judgment denying any relief to Winkel.

## FACTUAL OVERVIEW

Winkel is the current owner of an 80-acre tract of farmland (farm) in Mitchell County that contains a farmstead on the east side of the tract. In 1952, the north/south road on the east side of the farm was rebuilt and a new curve in the road left a triangular-shaped tract of 1.52 acres ("triangle tract") on the east side of the highway, separated from the remaining acreage on the west side of the highway. The old north/south road on the east side of the triangle tract remained open.

In connection with the 1952 highway project, a condemnation action established an easement on the triangle tract for a "highway right of way." However, the owner of the farm continued to conduct farming operations on the triangle tract for decades, until KDOT ordered Winkel to vacate the premises in 1994. That action was prompted by KDOT's fee simple acquisition of a strip of land adjacent to the triangle tract, on the east side of the old road, to be used as an asphalt mixing strip. KDOT intended to, and subsequently did, use the triangle tract to support the mixing strip operations, *e.g.*, to store raw materials and park trucks. The old road was used to access the triangle tract and the mixing strip. Unbeknown to the parties, Mitchell County had vacated the old road as a public right of way in 1993, reverting ownership of the

west half of the roadway to Winkel. We will refer to the reverted portion of the road as the "access tract."

In the first lawsuit, Winkel sought to permanently enjoin the operation of the mixing strip and to recover damages. Winkel proceeded on the theories that the mixing strip operations created a nuisance in the form of noise, dust, and odor which interfered with Winkel's use of the farmstead; that the noise, dust, and odor from the operation were trespassing upon his farmstead; and that an action for inverse condemnation was created by the reduction in value of the farm caused by the adjacent mixing strip.

The district court granted KDOT summary judgment. The Court of Appeals agreed with the district court's finding "that the interference with [Winkel's] use of his property was trivial at best and that it did not, as a matter of law, cause substantial and unreasonable interference with the use of his property." *Winkel I*, slip op. at 8. Referencing the Notes on Use for PIK Civ. 2d 3.05, *Winkel I* found that the trial court should not permit a nuisance case to go to the jury, if the evidence shows no more than trivial harm. Further, the *Winkel I* court agreed with the finding that Winkel had failed to support his trespass claim with any evidence of a direct or tangible invasion of his property by pollutants or dust. Slip op. at 19-20. Finally, *Winkel I* rejected the inverse condemnation claim because there was simply no evidence of a taking of the remaining acreage by the State of Kansas. Slip op. at 22.

Winkel let the matter rest for several years, during which KDOT continued to operate the mixing strip. In 2003, Winkel filed an action, again seeking to permanently enjoin the mixing strip operation, and asking for a declaratory judgment that KDOT's use of the property exceeded the scope of the original highway right of way easement. During discovery, the parties learned that the old road had been vacated, *i.e.*, that Winkel owned the west half. KDOT acknowledged that it had no easement to use the access tract. Nevertheless, the district court again granted summary judgment to KDOT, finding the use of the triangle tract and access tract to be consistent with the originally condemned easement.

On appeal, *Winkel II* rejected Winkel's claim that KDOT's nonuse of the easement for 42 years, from 1952 to 1994, effected an

abandonment of the triangle tract easement. Slip op. at 5. Likewise, the Court of Appeals found that G.S. 1949, 68-413 (1951 Supp.) did not require KDOT to obtain a fee simple absolute interest in the triangle tract, contrary to Winkel's proffered statutory interpretation. Slip op. at 8.

However, given KDOT's concession that it had no legal interest in the access tract and that it owed Winkel compensation for its use of that land, *Winkel II* found the district court had erred in finding KDOT's use of the access tract to be consistent with the original easement. Slip op. at 6. Likewise, the Court of Appeals opined that the applicable statutes differentiated an easement providing access to the materials necessary for highway construction from an easement for the actual roadway; and that KDOT's mixing strip use placed an additional burden on the servient estate. Therefore, the original highway right of way did not contemplate or include an easement to access or support a mixing strip which provided materials for highways in general. Slip op. at 11-12. Therefore, the district court's declaratory judgment on those issues was reversed. However, *Winkel II* affirmed the district court's denial of injunctive relief, finding that any harm that Winkel had suffered did not outweigh the adverse impact an injunction would have on the public interest and that Winkel had an adequate remedy at law. Slip op. at 14.

Thereafter, failing in its attempt to negotiate a resolution on Winkel's damages, KDOT filed an eminent domain action to condemn an appropriate easement in both the access tract and the triangle tract. The condemnation petition provided a metes and bounds description of each tract, *i.e.*, it did not purport to condemn the entire farm. The appointed appraisers' report set the value of the two tracts at $1,773 before the taking and at no value after the taking. Winkel appealed the award, but that action was stayed after Winkel filed a separate action, again seeking an injunction and damages under the recycled theories of nuisance and inverse condemnation.

The district court rejected Winkel's argument that the current version of K.S.A. 68-413 did not authorize KDOT to condemn an easement, but rather required it to condemn a fee simple absolute

interest. Consistent with *Winkel II*'s interpretation of the earlier version of the statute, the district court opined that the statute permitted, but did not require KDOT to condemn a fee simple interest.

The district court also found that KDOT's use of the two tracts to be lawful and necessary to its public purpose; that KDOT's eminent domain petition properly described the property being taken; that the measure of damages for the taking can be addressed in the condemnation appeal, precluding the inverse condemnation claim; that Winkel's nuisance claim is based upon the same allegations of interference which were found to be trivial in *Winkel I*; that Winkel failed to proffer any evidence of a material change in the mixing strip operations since 1994, other than a cessation of operations from mid-2004 to December 2006; and that the claimed damages in Winkel's nuisance allegation are permanent in nature, arising in 1994, and are therefore barred by the 2-year statute of limitations.

On appeal, Winkel challenges KDOT's exercise of its power of eminent domain, complains that KDOT manipulated the legal description in its condemnation petition, and disputes that the nuisance claim is barred by res judicata, the statute of limitations, or the statute of repose. We will address Winkel's issues in the order presented.

## POWER OF EMINENT DOMAIN

Winkel's first issue of whether KDOT properly exercised its statutory power of eminent domain is divided into three parts: (a) Did the district court properly determine on summary judgment that KDOT had established a need for this particular property for its mixing strip? (b) Does KDOT have the authority under K.S.A. 68-413 to acquire an easement to use the land as an asphalt mixing strip? and (c) Can KDOT be enjoined from an improper use of eminent domain?

### Standard of Review

The overarching standard of review for an appeal of a summary judgment is well established, but to be complete we repeat it here:

" ' " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).' *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005)." *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 39, 169 P.3d 1052 (2007).

### Necessity

Winkel asserts that KDOT failed to establish, as a matter of law, that the triangle tract and access tract were necessary for its lawful purpose. However, Winkel does not dispute that an asphalt mixing strip is necessary for the construction and repair of highways, KDOT's principal mission. Nor does Winkel suggest that KDOT does not need an area to store raw materials, park vehicles, and otherwise support the mixing strip. Rather, Winkel's complaint is that there were other locations in Mitchell County that KDOT could have used and Winkel should have been given an opportunity to prove that to a jury.

Winkel acknowledges that the courts defer to the reasonable discretion of an agency with eminent domain powers in its determination of the necessity to take land for its lawful corporate purposes. The necessity determination "will not be disturbed on judicial review unless fraud, bad faith, or an abuse of discretion is shown. [Citations omitted.]" *Schuck v. Rural Telephone Service Co.*, 286 Kan. 19, 25, 180 P.3d 571 (2008). Nevertheless, Winkel argues that there was simply no evidence to support KDOT's determination of necessity. We disagree.

Winkel's argument evaporates when one considers that the subject eminent domain action does not involve the mixing strip. KDOT had already acquired that land from someone else, and

Winkel has no standing to challenge KDOT's ownership of the mixing strip. The triangle tract, being situated adjacent to the mixing strip, is clearly and obviously the best location in Mitchell County to store raw materials and park vehicles used in the nearby asphalt mixing operation. Winkel's suggestion that numerous locations, miles away from the mixing strip, would be just as suitable for KDOT's purposes is counterintuitive; such an offsite location would be, at best, impracticable. Moreover, any argument that the access road is not necessary for KDOT's purpose is simply nonsensical. That land provides the necessary ingress and egress for the mixing strip. Accordingly, summary judgment on the issue of necessity was not only appropriate, it was mandated by the evidence.

### Statutory Authority to Obtain an Easement

Winkel resurrects the curious argument from *Winkel II* that the applicable statute required KDOT to condemn a fee simple interest, rather than an easement. Given that the appraisers found that the entire value of the two tracts had been taken, the distinction is not compelling. Nevertheless, the *Winkel II* court held that the prior statute permitted, but did not require KDOT to condemn a fee simple interest. Slip op. at 8. The current statute, K.S.A. 68-413, did not change that law.

The crux of Winkel's argument is that subsection (b)(4) is a limitation on the rights granted in subsection (a). In relevant part, K.S.A. 68-413 provides:

"(a) Subject to subsection (b), the secretary of transportation, in the name of the state, may acquire title or easement by purchase, dedication or by the exercise of the right of eminent domain: (1) To or upon any lands or interests or rights therein; (2) to water, gravel, stone, sand or other material; (3) to spoil banks or to borrow pits necessary for the construction, reconstruction, improvement, maintenance or drainage of the state highway system; or (4) to access ways to spoil banks or borrow pits or any bed, pit, quarry or other place where gravel, stone, water, or other material required in the construction, reconstruction, improvement, maintenance or drainage of the state highways may be located. The secretary of transportation, in the name of the state, may acquire, by purchase, title to an entire lot, block or tract of land for state highway purposes even though such entire lot, block or tract is not immediately needed for state highway purposes, if the secretary finds that by so doing the interests of the public will be

best served, and without limiting the foregoing, the same may be done where uneconomic remnants of land would be left the original owner or where severance or consequential damage to a remainder make the acquisition of the entire lot, block or tract more economical to the state.

"(b)(1) Exercise of the right of eminent domain by the secretary shall be in accordance with and governed by article 5 of chapter 26 of the Kansas Statutes Annotated, and amendments thereto.

(2) Every petition filed by the secretary to acquire lands or any interest in or title thereto by the exercise of the right of eminent domain shall set forth the extent, quantity and nature of the interest or title to be acquired.

(3) Except as otherwise provided in paragraph (4) of this subsection (b), the secretary shall not acquire by eminent domain any right, title or interest in or to the oil and gas minerals under or in any lands, and the petition in any condemnation proceedings shall state that right, title or interest in or to such oil and gas minerals is not being condemned.

(4) The secretary may acquire by eminent domain the fee simple title to lands when such lands are acquired for sites for the construction of buildings or improvements necessarily incident to the operation, maintenance and supervision of a state system of highways."

Statutory interpretation is a function of law over which this court has unlimited review. *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008). The first step is to ascertain legislative intent from the plain language employed in the statute. See *Winnebago Tribe of Nebraska v. Kline*, 283 Kan. 64, 77, 150 P.3d 892 (2007).

Here, the legislature used the word "may" in subsection (b)(4), whereas in subsections (b)(1), (2), and (3) it used the word "shall." The statute's plain language creates a presumption that the legislature intended to make the acquisition of a fee simple interest under subsection (b)(4) permissive, *i.e.*, at KDOT's option.

Winkel's answer to the plain language interpretation is to suggest that, because subsection (a) permits KDOT to acquire an easement, subsection (b)(4) would be superfluous if it likewise permitted the acquisition of an easement. A cursory reading of the statute reveals the fallacy of the argument. Subsection (a) addresses the property which may be acquired, while subsection (b) principally speaks to the extent, quantity, and nature of the interest or title that may be acquired in that property.

Moreover, subsection (b)(3) specifically precludes the acquisition of "any right, title or interest in or to the oil and gas minerals under or in any lands." K.S.A. 68-413. Obviously, if KDOT acquires land without the minerals interest, it has not acquired a fee simple interest. However, the minerals interest prohibition in subsection (b)(3) is prefaced by the statement, "[e]xcept as otherwise provided in paragraph (4) of this subsection (b)." K.S.A. 68-413. Thus, subsection (b)(4) serves the purpose of allowing KDOT to acquire a fee simple interest, *i.e.*, including the minerals interests, in land that it will use for the purposes described in that subsection. Therefore, subsection (b)(4) is not superfluous, and we will apply it exactly as it is written. KDOT was not required to condemn a fee simple interest in Winkel's land.

*Availability of Injunction for Improper Use*

Winkel uses this issue to attack our long-standing precedent, recently reiterated in *Schuck*, 286 Kan. at 24, that injunctive relief will not be granted if there is an adequate remedy at law. Winkel argues that, as a practical matter, such a rule precludes injunctive relief ever being granted in a condemnation proceeding, because all takings are compensable with money damages. Accordingly, Winkel warns us that the practical result of the adequate remedy at law rule is that condemning agencies will have no incentive to comply with the eminent domain statutes because they can just do whatever they want, so long as they pay value for any property wrongfully taken.

KDOT counters that this court has, in fact, enjoined the inappropriate use of eminent domain by a public utility, citing to *McGinnis v. Kansas City Power & Light Co.*, 231 Kan. 672, 647 P.2d 1313 (1982). In *McGinnis*, this court held that if the utility could not show compliance with statutory regulations for exercising its power of eminent domain, the injunctive relief issued by the district court should remain in place. 231 Kan. at 685.

We decline Winkel's invitation to engage in a theoretical debate on the public policy considerations of declining to grant injunctive relief in hypothetical scenarios. This case does not present an indiscriminate and obviously wrongful taking for an unnecessary pur-

pose. Indeed, the case highlights the rationale for exercising restraint in granting injunctive relief.

Before Winkel acquired ownership of the triangle tract, it was encumbered by an easement for highway right of way purposes. KDOT had a legally established dominant estate in the property, whereas Winkel's interest was the servient estate. One might be curious whether Winkel's predecessor in title received compensation for that easement equivalent to the total fair market value of the 1.52 acres in 1952, *i.e.*, whether the landowner has already been fully paid for the land. Nevertheless, KDOT's use of the triangle tract to support its mixing strip was based upon a claimed legal right, emanating from its existing easement, which was neither frivolous nor contrary to any existing case precedent. In such a circumstance, the appropriate and legally sound remedy for KDOT's misreading of its legal rights to the property is to pay the landowner such *additional* compensation as may be appropriate for the *increase* in burden on the servient estate occasioned by the change in its use.

Likewise, both parties were laboring under the misconception that the access tract was dedicated to the public's use as a roadway, *i.e.*, Winkel was not possessing or using that land. To Winkel, the only practical change in circumstances is that KDOT will have the sole right to use the roadway, instead of everyone using it as such. Under that scenario, Winkel cannot show that irreparable future injury is likely; that his injury, if any, outweighs the damage of an injunction; or that the injunction would not be adverse to the public interest. See *Schuck*, 286 Kan. at 24. To the contrary, any money damages Winkel receives for the .45 acre, half a roadway, will be more than an adequate remedy.

In short, Winkel has not persuaded us that we need to change the entire body of law in this State that makes the existence of an adequate remedy at law a factor in assessing whether injunctive relief is appropriate.

## LAND DESCRIPTION/INVERSE CONDEMNATION

Next, Winkel complains that KDOT manipulated the condemnation appraisers by the manner in which the land was described

in the petition. KDOT listed the legal description of the two tracts being taken. Winkel believes the petition should have, in some manner, described the tracts as being a part of the whole farm, so that the appraisal report would have included the reduction in value on the remaining approximately 78 acres occasioned by the taking of the two, physically separated tracts. Therefore, Winkel included a claim for inverse condemnation, seeking the alleged devaluation of the remaining land.

K.S.A. 68-413(b)(2) directs that every condemnation petition filed by the Secretary of Transportation "shall set forth the extent, quantity and nature of the interest or title to be acquired." Here, KDOT precisely complied with that statute. See also K.S.A. 26-502 (contents of eminent domain petition). Winkel's complaint about the condemnation petition is unfounded.

Likewise, Winkel's purported claim for inverse condemnation is unavailing. *Winkel I* clarified that Winkel did not have an action for inverse condemnation for any reduction in value of the remaining land caused by KDOT's operation of the asphalt mixing strip, *i.e.*, the noise, odor, dust, or pollution from the operations did not effect a taking of the remaining land. Any compensable reduction in the remaining land's value must flow directly from the taking of the easements on the triangle and access tracts. The damage caused by KDOT's taking is the subject of the existing formal condemnation proceedings. "An inverse condemnation proceeding . . . is available when private property has been taken for public use *without the initiation of formal condemnation proceedings* by the governmental taker." (Emphasis added.) *Schuck*, 286 Kan. at 28. This rule is well established. See *Kau Kau Take Home No. 1 v. City of Wichita*, 281 Kan. 1185, 1189, 135 P.3d 1221 (2006) (inverse condemnation action arises when formal condemnation proceedings have not been filed); *Nat'l Compressed Steel Corp. v. Unified Gov't of Wyandotte County/Kansas City*, 272 Kan. 1239, 1245, 38 P.3d 723 (2002) (inverse condemnation action "available only where private property has been actually taken for public use without formal condemnation proceedings and it appears that there is no intention or willingness of the taker to bring such proceedings"); *Deisher v. Kansas Dept. of Transportation*, 264

Kan. 762, 766, 958 P.2d 656 (1998) (" '[A]n inverse condemnation proceeding is a substitute for a formal condemnation proceeding. It is not a supplement for a formal proceeding that does not yield all of the satisfaction that a landowner desires.' "). Accordingly, summary judgment denying Winkel's inverse condemnation claim was appropriate.

Winkel's real complaint is with the manner in which the appraisers valued the land. He contends that they treated the case as being a taking of two entire tracts, rather than a partial taking from a larger tract. The appraisers were instructed on K.S.A. 26-513, which sets forth guidance for valuing condemned land. Part of that instruction is that if an entire tract of land is taken, the measure of compensation is the fair market value of the property at the time of taking. K.S.A. 26-513(b). However, if only a part of a tract of land is taken, the compensation and measure of damages is the difference between the fair market value of the entire property before the taking, and the value of that portion of the tract which remains immediately after the taking. K.S.A. 26-513(c). However, the appraisers sent mixed signals as to the measure of damages they were employing.

In their report, the appraisers noted that they had begun the process "by actual view of the lands to be taken and of the tracts of which they are a part." Further, they submitted a value for the two tracts before taking and a value after taking. This suggests that the appraisers were treating this case as a partial taking under K.S.A. 26-513(c). However, they only submitted a dollar amount for the pre-taking value of the two tracts, standing alone, which suggests an entire taking under K.S.A. 26-513(b). If they had considered the two tracts as being taken from the entire farm, the appraisal should have set forth a value for the entire farm (including the 2 acres to be taken) before the taking and the value of the approximately 78 remaining acres after the taking.

Of course, any valuation of the triangle tract, whether standing alone or included in the entire farm, should have taken into consideration that it was already encumbered by a highway right of way easement. Likewise, one might debate whether land which has

previously been partially taken and physically separated from the remaining farm continues to be a part of the larger tract.

Nevertheless, the bottom-line question is the amount of just compensation to be paid for the land or the interest therein being taken by KDOT, which is the sole issue now pending in Winkel's appeal of the condemnation award. K.S.A. 26-508. Winkel is free to challenge the appraisers' methodology or valuation in that proceeding. A separate inverse condemnation action is neither necessary nor permissible.

*PRECLUSION OF NUISANCE CLAIM*

Winkel challenges the district court's finding that the nuisance claim was barred by the statute of limitations and makes the preemptive argument that res judicata and the statute of repose are inapplicable, as well. The arguments present issues of law, subject to de novo review. See, *e.g., Stanfield v. Osborne Industries, Inc.,* 263 Kan. 388, 396, 949 P.2d 602 (1997), *cert. denied* 525 U.S. 831 (1998) (application of doctrine of res judicata a legal question).

With respect to the statute of limitations, the district court analyzed whether the claimed nuisance was temporary or permanent. The cases attempting to make that distinction are not always easy to reconcile. See *Dougan v. Rossville Drainage Dist.,* 270 Kan. 468, 477, 15 P.3d 338 (2000) (although drainage ditch was a permanent structure, the flooding caused thereby was a temporary nuisance); *Isnard v. City of Coffeyville,* 260 Kan. 2, 11, 917 P.2d 882 (1996) (storm sewer was permanent nuisance from which future damages due to flooding could be reasonably determined). We perceive that we need not muddy those waters to resolve this case.

Nearly 13 years ago, our Court of Appeals ruled that, as a matter of law, the noise, odor, and dust created by KDOT's operation of the asphalt mixing strip did not create a substantial and unreasonable interference with Winkel's right to enjoy his property. *Winkel I,* slip op. at 17. In 2003, Winkel again sought to enjoin KDOT's operation of the asphalt mixing strip, albeit on other theories. In this recycled nuisance claim, Winkel presents essentially the same complaints that were litigated in *Winkel I,* modified only slightly

to include unsupported allegations of "ground and possibly water contamination."

"The doctrine of res judicata (or claim preclusion) prohibits a party from asserting in a second lawsuit any matter that might have been asserted in the first lawsuit." *Stanfield*, 263 Kan. at 397. Res judicata prevents relitigation where the following requirements are met: " '(1) identity in the thing sued for, (2) identity of the cause of action, (3) identity of persons and parties to the action, and (4) identity in the quality of persons for or against whom claim is made.' " *Waterview Resolution Corp. v. Allen*, 274 Kan. 1016, 1023, 58 P.3d 1284 (2002) (quoting *Regency Park v. City of Topeka*, 267 Kan. 465, 478, 981 P.2d 256 [1999]).

Winkel is suing KDOT for the third time to stop the mixing strip operations, *i.e.*, the parties involved and the relief sought are identical. *Winkel I* involved the identical cause of action, *i.e.*, a nuisance claim alleging that KDOT's mixing strip operations interfered with Winkel's farmstead use and devalued the remaining 78 acres of the farm. In *Winkel II*, Winkel had all of the information necessary to challenge KDOT's operations subsequent to the first lawsuit, *i.e.*, a nuisance claim could have been asserted.

Winkel justifies the relitigation of this issue by alleging that the number of days that KDOT actually operated the mixing strip during the period from 1994 to 2004 exceeded the 17 days per year of predicted use relied upon in the 1994 lawsuit. In other words, Winkel apparently suggests that he has a new and independent cause of action for nuisance based upon new facts. We disagree.

In an affidavit, Karl Winkel stated that a diary of KDOT's use of the property had been kept since 1994, except for a 2-year period from late 1999 to early 2002. He relies on the diary as the proof that the interference with his farmstead use is now substantial and unreasonable. The record reflects the following use: March to December 1994—94 days; 1995—54 days; 1996—25 days; 1997—59 days; 1998—24 days; March to October 1999—27 days; 2002—34 days; 2003—27 days; 2004—28 days.

We agree with the district court that Winkel has not established a material change in the circumstances, since the nuisance claim was originally litigated. Winkel's assertion that the *Winkel I* opinion

was premised upon only 17 days of operation is inaccurate. That court actually said that "the asphalt plant in question is *operated only occasionally* and may be operated *as few as 17 days a year.*" (Emphasis added.) *Winkel I*, slip op. at 15. Moreover, the decision recited the district court's finding that " '[t]he hauling in and mixing of road repair material takes approximately twenty (20) days per year. *In addition, the repair aggregate is hauled out on an intermittent basis.'* " (Emphasis added.) Slip op. at 6-7. Pointedly, Winkel's affidavit does not separately note how many of the days of recorded use involved the hauling out of repair aggregate, *i.e.*, that were in addition to the operation of the mixing strip, as contemplated by the trial court.

Even viewing the evidence in a light most favorable to Winkel, KDOT's use of the triangle tract after 1994 was within the parameters of the occasional and intermittent operation contemplated by *Winkel I*. Winkel's affidavit does not support an argument that KDOT's subsequent use of the property has materially increased so as to support a new and independent action for nuisance. *Winkel I's* holding that the harm created by the asphalt mixing strip is trivial remains valid. The district court correctly granted summary judgment in favor of KDOT.

Affirmed.

EDWARD E. BOUKER, District Judge, assigned▮